**Wade CUMMINS, p/k/a Elvis Wade, Plaintiff-Appellee,**

v.

**Steve BRODIE and Elvis Wade International, Incorporated, Defendants-Appellants.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Dec. 30, 1983.

Application for Permission to Appeal Denied by Supreme Court March 12, 1984.

---

Larry D. Woods, William J. Marett, Jr., Woods, Bryan, Woods & Watson, Nashville, for plaintiff-appellee.

Stanley M. Chernau, William L. Rosenberg, Denney, Lackey & Chernau, Nashville, for defendants-appellants.

## OPINION

LEWIS, Judge.

Plaintiff Wade Cummins, p/k/a Elvis Wade (hereinafter Cummins) filed suit against defendant Steve Brodie (hereinafter Brodie) and Elvis Wade International, Inc. alleging breach of contract, fraud, misrepresentation, and violation of the Tennessee Consumer Protection Act, T.C.A. § 47–18–101 *et seq.*, because Cummins cancelled several nightclub performance dates upon Brodie's advice and Brodie failed to obtain any replacement bookings. Cummins is an entertainer who does Elvis Presley imitations at night clubs and fairs. Brodie is an entrepreneur in the music business who founded Transcontinental Record Sales, Inc., in Buffalo, New York, has an ownership interest in Cartee Music Publishing Company in Nashville, Tennessee, owns Sahara Records in California, and produced a movie in California. Elvis Wade International, Inc. is a to-be-formed corporation whose purpose is to exploit the musical career of Cummins with Cummins, Brodie, and Alan Cartee, who is not a party in this suit, as its shareholders. Although the corporate charter was filed with the secretary of state, the corporation was not capitalized. It did not make an appearance in this case and was not represented by counsel.

Cummins had been doing his imitation of Elvis Presley for about fourteen years before the events that resulted in this lawsuit. He testified that he had little problem finding work and usually worked 150 to 200 days a year. The testimony is somewhat ambiguous, but apparently his usual fees were between $2,400 and $3,500. However, sometimes his fees dropped as low as $1,250 and, after Presley's death, sometimes his fees were as high as $7,500. His usual expenses, including salaries, transportation, and occasional lodging for himself and his band, were around $1,100. He used two booking agencies, Celebrity Management, Inc. (hereafter Celebrity Management) and Century II Promotions (hereinafter Century II), and also did some booking himself. A six-piece band travelled with him and he paid their salaries and expenses.

After Elvis Presley died in August of 1977, there was an increased interest in Presley, amounting to a "mania." Other singers began doing Elvis impersonations and Cummins, along with the newcomers, began to receive increased attention. Cummins produced a record, "Memories of the King," almost immediately after Presley's death. Unfortunately, the record did not sell well. However, audience size increased and there was some increase in the fees Cummins could charge, although he had several engagements at the contract price negotiated before Presley's death.

Cummins first met Brodie after a show in Texas in September, 1977. They were introduced by Alan Cartee. Cummins had met Cartee a short time before that through a long time friend in whom he placed great trust. Cartee was in the studio recording business and had sold fifty percent (50%) of his publishing catalog to Brodie in a prior business deal. Cummins testified that at the meeting after the Texas show Brodie told him that "he owned a movie company ...[,] he was very much involved in television ...[,] he had discovered Linda Carter ... he also was involved in a record company ... [a]nd that he's been in the record business for twenty some odd years in Buffalo, New York." Cummins further testified that Brodie said "he was very impressed with the show and very impressed with the amount of money that [Cummins] was making ... and he offered [Cummins] a deal." "He said he was interested in promoting [Cummins'] career ... and wanted [Cummins] to play the lead role [in a movie.]" "He also mentioned that he could get ... a television special...." "And he also said that he wanted to produce an album ... and start on that immediately." The album was to be "of original material in an Elvis voice ...."

Cummins testified that when he asked for "all this stuff" in writing, Brodie "said

he could guarantee ... a movie ... [because] he owned the company." He also assured Cummins that he could get a television special. Cummins made it clear he was making a comfortable living and "wouldn't be interested in going into any kind of agreement unless [he] could be guaranteed that [he] was going to continue making that living." He wanted to be "guaranteed X amount of money."

After several phone calls from Brodie, Cummins received a "letter of intent" which mentioned the movie, the television special, the album, and a $5,000 per week salary and proposed the formation of a corporation to manufacture, produce, and distribute records, tapes, films, and television shows. Profits of the corporation were to be divided according to shares. Cummins was to be fifty (50%) percent shareholder and Brodie and Cartee were each to own twenty-five (25%) percent. The letter was signed by Cummins, Brodie, and Cartee. The three shareholders-to-be met with an attorney to discuss the formation of a corporation and on October 31, 1977, the articles of incorporation were filed with the secretary of state of Tennessee. Cummins also signed an exclusive employment agreement with the corporation, one day before the articles of incorporation were filed. This agreement was signed and accepted by Brodie.

Sometime shortly after the letter of intent was signed, Cummins made an album in Cartee's studio in Muscle Shoals, Alabama. Cartee testified that at the recording session Brodie, Cummins, and Cartee discussed the ten songs included on the album and decided to record five more in an attempt to appeal to more markets. Brodie paid $40,000 for the production of the album which covered the cost of the original ten songs, but not the additional five. Studio musicians and over dubbing with additional background singers and string players were used to create a sound close to the Elvis Presley style.

Cummins had used a six-piece band in his show before Brodie and Cartee entered his professional life. Cummins testified that

Brodie wanted him to increase the size of the band to seventeen to be an attraction in Las Vegas. Cartee testified that "we" decided "to beef up the band." Brodie testified that Cummins and Cartee made the decision. All three went to Murfreesboro, Tennessee, to lease a bus to transport the larger band on October 31, 1977. Cummins paid for the bus with the expectation that Brodie would reimburse him. He also increased the size of his band.

Cummins testified that after cutting the album, Brodie wanted to immediately cancel all the dates scheduled for the rest of the year. Brodie was in contact with the Aladdin Hotel in Las Vegas and indicated that he could get Cummins $75,000 a week. He also wanted all promotions stopped so he could control what the media said about Cummins. Cummins testified that when he expressed reservations about cancelling the engagements Brodie reminded him that Brodie was a millionaire and was controlling the reins. Still, Cummins insisted that he would work the dates scheduled until January 1st.

Cummins did cancel several engagements with his booking agents. He testified that Brodie was guiding his career and had directed him to cancel. Brodie testified that he was not involved with the booking and that Cummins and Cartee were involved in that area. In addition to cancelling dates, Cummins, Celebrity Management, and Century II ceased booking future dates. In depositions presented as evidence at trial, representatives of both booking agencies testified that they cancelled approximately 15 to 20 dates each. Actual business records were not presented as evidence at the deposition or at trial. The booking agents also testified that Cummins indicated that Brodie was in control of his career and that he said cancel the bookings.

After January 1, 1978, Cummins worked only two engagements that had been sold out before he ordered the cancellation of his bookings. Cummins began rebooking his act and accepting engagements through Century II around the first of January.

However, because engagements must be scheduled several months in advance, Cummins was essentially out of work from January to April of 1978.

Brodie did make some efforts to aid Cummins' career. He purchased the single, "Memories of the King," from Cummins, remastered it, and re-released it on Sahara Records. In addition to the $40,000 to produce the album, Brodie also spent approximately $15,000 to promote it by hiring people who specialize in this type of promotion, distributing it to radio stations across the country, and attending a press conference in Birmingham and a music festival in Miami. He arranged at least one press conference in Nashville before Cummins recorded the album. At this press conference, Brodie or someone working for him, arranged for at least one person to represent that he was a radio disc jockey when he was actually a printer. It is unclear whether this was to mislead Cummins or any real disc jockeys who were also at the event.

Although Brodie testified that he was not to be involved with bookings, only with record production, he did have discussions with Associated Bookings Corporation and rejected an offer to do a Japanese commercial because he thought it would not be advantageous to Cummins' career to leave the country immediately after doing a new album. He also had contact with the Aladdin Hotel in Las Vegas and rejected an offer for Cummins to perform there because the payment would have been a percentage of the gate and the time offered, the week after Christmas, was a slow period. He rejected these offers without consulting Cummins.

The Trial Court, after a hearing, found that Cummins was not a consumer as defined by the Tennessee Consumer Protection Act, T.C.A. § 47–18–101 *et seq.*, that since the corporation was never capitalized it was not an entity through which business could be conducted and was not a shield for personal liability, that Cummins was harmed by the cancellation of existing bookings and loss of potential bookings,

that "the entire atmosphere of this agreement, if not the wording itself, indicated that Mr. Brodie was going to take over control of the booking," and that Cummins lost twenty-five (25) engagements with an average profit of $3,000 each and entered a judgment of $75,000 plus costs in favor of Cummins.

On appeal, the defendant Brodie alleges: that there was insufficient evidence to support a judgment that he is liable to Cummins for damages because the preponderance of the evidence is contrary to the Court's finding and the "atmosphere of the agreement" is an erroneous conclusion and unsupported by the evidence; that Cummins' proof of damages was insufficient to support an award because the damages were uncertain, contingent, and speculative, and that the award was inconsistent with Cummins' evidence; and that the amount of the award did not account for Cummins' failure to mitigate damages.

Cummins' pleading alleges that his loss of revenue from performances cancelled is a proximate and direct result of false representations by Brodie. He also alleges breach of oral and written agreements. Cummins did not put on any direct proof from which a court could sustain a finding of fraudulent misrepresentation. In Tennessee, a plaintiff must prove "a statement of an existing or past material fact, made with knowledge of its falsity or with reckless disregard of the truth.... [A] misrepresentation of intention or a promise without intent to perform is legally insufficient to support a claim for ... damages." *Fowler v. Happy Goodman Family,* 575 S.W.2d 496, 499 (Tenn.1978). The Trial Court held that the cancellation of the bookings "was a harmful breach of the entire agreement unless something else was put in its place. It wasn't." From this, we infer that the Trial Court's finding was based on breach of contract theories rather than misrepresentation theories. The Trial Court also said that "the entire atmosphere of this agreement, if not the wording itself, indicated that Mr. Brodie was going to take over control of the book-

ing." The Trial Court was not looking to the express contract as embodied in the letter of intent or in the employment agreement, neither of which mentioned the responsibility of booking, but rather to the conduct of the parties as an indication of an implied contract.

In Tennessee,

any conduct from which a reasonable person in the offeree's position would be justified in inferring a promise in return for the requested act, amounts to an offer, and that such a request might be implied when the facts and circumstances are such that the person receiving the benefit of such work or services know, or reasonably should have known, that the person doing the work expected to be compensated.

*In re Estate of Holding*, 61 Tenn.App. 654, 663–664, 457 S.W.2d 545, 549 (1969). In *V.L. Nicholson Co. v. Transcon Investment and Financial Ltd., Inc.*, 595 S.W.2d 474 (Tenn.1980), the Tennessee Supreme Court found an implied contract existed and there was an implied promise to pay when one party does work for another, the other knew about the work, the work was useful and would normally be done for pay, and the other does not object or accepts the work. The words or conduct of the party receiving the work must lead the worker to infer a promise to pay. "Generally, an implied contract is one which is inferred from the conduct of the parties; it is not necessarily expressed in words." *Id.* at 482.

We think the same reasoning applies in this case. Here, Brodie did not receive Cummins' services but he did receive Cummins' increased availability to be booked at higher rates. Cummins cancelled bookings in reliance on Brodie's representation that he could get more money and on his conduct in talking with Associated Bookings Corporation and the Aladdin Hotel. Here, a reasonable person in Cummins' position would infer a promise to make more than a few minor attempts to get more engagements in place of the cancelled ones. A reasonable person in Brodie's position

would know that Cummins expected more bookings at an increased fee.

This Court must accept the findings of the Trial Court when there is conflicting testimony, unless other real evidence requires a contrary result. *Linder v. Little*, 490 S.W.2d 717 (Tenn.App.1972). The Trial Court has observed the manner and demeanor of the witnesses and can evaluate the credibility of the witnesses. *Capital City Bank v. Baker*, 59 Tenn.App. 477, 442 S.W.2d 259 (1969). Cummins testified that Brodie was in charge of his career and bookings; Brodie testified that he had nothing to do with bookings. We must accept the finding of the Trial Court as to veracity. Here, in addition to the testimony, we also have Brodie's behavior in talking with booking agencies to indicate that he had taken over Cummins' booking.

Brodie contends that the Trial Court's finding of liability because of the "atmosphere" of the "dealings" is an erroneous conclusion. We are of the opinion that the Trial Court's terminology was not addressed to any "conclusions" but rather was an explanation of the standard used by the Court in finding an implied contract. The court must look to the conduct of the parties in light of the circumstances, *i.e.*, the court must look to the atmosphere of the dealings. *See V.L. Nicholson Co. v. Transcon Investment and Finance, Ltd., Inc.*, 595 S.W.2d 474 (Tenn.1980); *In re Estate of Holding*, 61 Tenn.App. 654, 663–664, 457 S.W.2d 545, 549 (1969). Upon review of the record and giving consideration to the Trial Court's ability to determine credibility, we are of the opinion that Brodie had taken control of Cummins' career in return for twenty-five (25%) percent of Cummins' net profit, that he either instructed or knew of Cummins' cancellation of bookings, that he approved of the cancellations, that Cummins relied upon Brodie's promises of substantially higher earnings in cancelling the bookings, and that Brodie did little or nothing to obtain replacement bookings.

■ Brodie has repeatedly pointed out that he would have no motive to sabotage

Cummins' career. The Trial Court's finding had nothing to do with motive. Rather the finding is based solely on the finding that Brodie induced certain actions by Cummins, that Cummins reasonably relied on Brodie's statements, and that Brodie then failed to adequately pursue his duty to improve Cummins' earnings. Therefore, we find the preponderance of the evidence supports the Trial Court's finding of liability.

We also hold that there was adequate proof to support an award of damages. The courts will allow recovery even if it is impossible to prove the exact amount of damages from the breach of contract. Otherwise, in certain instances, the courts would be powerless to help some wronged parties. "Exact justice is not always attained, and the law does not require exactness of computation in suits that involve questions of damages growing out of contract of tort." *Provident Life and Accident Ins. Co. v. Globe Indemnity Co.*, 156 Tenn. 571, 576, 3 S.W.2d 1057 (1928). In *Coverdell v. Mid-South Farm Equipment Assoc., Inc.*, 335 F.2d 9 (6th Cir.1964), the court applied Tennessee law to determine that an insurance company agent who was informed by trustees of the defendant corporation that he had been hired under a personal service contract to organize their group insurance, worked an entire weekend on the project, and cancelled an appointment in Texas was damaged when the trustees gave the contract to another agent. Uncertain and speculative damages are prohibited only when the existence of damage is uncertain, not when the amount is uncertain. When there is substantial evidence in the record and reasonable inferences may be drawn from that evidence mathematical certainty is not required. *Id.* at 14.

We find here that the record amply supports the award of damages for twenty-five (25) engagements at $3,000 each. The booking agents testified that they each cancelled fifteen (15) to twenty (20) engagements. They also testified that they turned down other offers at a much higher rate than Cummins had been earning before Presley died. Neither the agents nor Cummins could remember exactly how many engagements were cancelled. However, the Trial Court chose to award damages for a number less than the total lowest estimate of the booking agents, thirty (30). Brodie has not provided us with a better measure than the judgment of the Trial Court.

One agent testified that his records were not available, the other testified that the records were probably in storage and that he did not bring them to his deposition. While we think it would have been better to produce the business records, the Trial Court was apparently satisfied that the memories of these deponents were satisfactory and reliable.

We do not think the Trial Court neglected to consider expenses. The testimony was that for fairs Cummins netted between $2,400 and $3,500 per appearance. For nightly appearances he got "anywheres from $3,500 to $7,500." His average expenses were $1,100. Apparently, there were very few engagements at $7,500. We think the Trial Court's choice of $3,000 was reasonable and supported by substantial evidence. Neither is there an inconsistency between Cummins' testimony and the Court's award.

The cases cited by defendant are good illustrations of the refusal of the courts to award speculative damages. However, they do not help his case. In *Maple Manor Hotel, Inc. v. Metropolitan Government of Nashville and Davidson County*, 543 S.W.2d 593 (Tenn.App.1975), the Court awarded damages against metropolitan government for closing part of the street which was the only means of access to plaintiff's property. Plaintiff had obtained a permit to build an apartment complex but the land was undeveloped when the road was closed. Plaintiff maintained that if the road had not been closed, it would have built the apartment complex. The court allowed damages for the fair rental value but denied damages for increased construction costs, loss of rental income, loss of

interest, and loss of cash flow. We think *Maple Manor Hotel* is consistent with the findings of the Trial Court in this case: although the exact number and exact value of the cancelled engagements cannot be ascertained, the award of damages is based on bookings Cummins actually had, not on potential engagements that the agents could not book. *See also, Brandtjen & Kluge v. Pope,* 28 Tenn.App. 679, 192 S.W.2d 496 (1945).

Courts will not award profits when there is no basis for estimating profits. For instance, this Court refused profits to a plaintiff who had a contract to provide gravel, stone, and chert to a roadbuilding contractor. However, the plaintiff had no experience dredging gravel from a river and preparing it for use. Therefore, plaintiff "had no information on which to base his estimation of profits." *Anderson-Gregory Co., Inc. v. Lea,* 51 Tenn.App. 612, 620, 370 S.W.2d 934 (1963). Here, Cummins had adequate information and past experience to estimate his profits. He would be in the same position as the plaintiff in *Anderson-Gregory* if he had never performed before and was only speculating about expenses. This is not the case. Cummins had enough experience from which he could estimate his profit, although not to a mathematical certainty.

This Court has upheld an award of damages for loss of business and inability to fulfill contracts because the manufacturer wrongfully replevined a printing press. The testimony on the amount of lost business was that the printer did not know the value and that when he rejected orders he did not "go into the details enough to know what the value would be." *Brandtjen & Kluge, Inc. v. Pope,* 28 Tenn.App. 679, 688, 192 S.W.2d 496, 500 (1945). Nevertheless, the Court found that the evidence, considering the nature of the case, provided reasonable, if not absolutely certain, basis for damages. *Id.* at 694, 192 S.W.2d at 501–501.

■ Defendant Brodie also asserts that because the agent did not produce records of contracts cancelled which he said were probably in existence in archives, Cummins should be bound by the presumption that the materials would not have supported his position. If a party could produce better evidence than that which is introduced, the presumption is that the better evidence would be detrimental and would clarify deficiencies which the introduced evidence did not. *E.g., Southern Coal and Coke Co., Inc. v. Beech Grove Mining Co., Inc.,* 53 Tenn.App. 108, 381 S.W.2d 299 (1963). However, that presumption concerns evidence that is controlled by a *party,* not a witness. Furthermore, defendant Brodie could subpoena the records as easily as plaintiff Cummins, since the depositions were taken seventeen days before trial.

■ Brodie also contends that Cummins failed to mitigate his damages. The standard for mitigation of damages is reasonable care; mitigation is not required if it is unduly burdensome or impossible. *Haynes v. Cumberland Builders, Inc.,* 546 S.W.2d 228 (Tenn.App.1976). The events of this lawsuit occurred in October and November. Since Cummins was relying on Brodie's assertion that Brodie would get Cummins better bookings for more money, it is reasonable that he would have to wait awhile for those bookings to arrive. We see nothing unreasonable about waiting until the first of January to begin rebooking via his regular channels. We think Cummins acted properly in attempting to mitigate his damages in January.

The holdings of the Trial Court are affirmed and the case remanded to the Trial Court to collect costs from the appellant.

CANTRELL and CONNER, JJ., concur.