William R. HOWELL, Plaintiff,

v.

ALUMINUM COMPANY OF AMERICA, INC., Defendant.

No. 3:96–CV–0250.

United States District Court, E.D. Tennessee.

Jan. 28, 1997.

I. Clinton Waddey, Jr., Waddey & Patterson, PC, Nashville, TN, John O. Threadgill, John O. Threadgill, PC, Knoxville, TN, for Plaintiff.

Wayne R. Kramer, Donelson M. Leake, Kramer, Rayson, Leake, Rodgers & Morgan, Knoxville, TN, Thomas G. Rohback, Leah J. Domitrovic, Margaret A. Keane, LeBoeuf, Lamb, Greene & MacRae, LLP, Pittsburgh, PA, T. Kenan Smith, Knoxville, TN, for Defendant.

### MEMORANDUM OPINION

JORDAN, District Judge.

This civil action is before the court for consideration of the defendant ALCOA's motion for summary judgment [doc. 21]. The court has heard oral argument by counsel, and has considered the material filed in support of and in opposition to the defendant's motion. The court finds the defendant's motion well taken, and will accordingly grant the motion, and dismiss this civil action.

The plaintiff Mr. Howell has worked for the defendant ALCOA for about 30 years, at the defendant's Tennessee operations plant in Alcoa, Tennessee. According to the allegations in the plaintiff's complaint [doc. 1], in fall 1992, Mr. Howell attended a crew meeting at his worksite at which Mark Vrablec, then the superintendent of the south ingot facilities at the Tennessee plant, spoke. The evidentiary material submitted by the parties shows that at this time, Mr. Vrablec was a supervisor of Mr. Howell, and that Mr. Vrablec was in the third tier of management at the Tennessee plant.

At this fall 1992 meeting, Mr. Vrablec discussed ALCOA's need to cut costs in its operations. One item mentioned in this regard was the cost of skim booms used at the south ingot facilities. A skim boom is a metal device, about 22 feet long, used to skim material off the top of molten alloys in furnaces, and also used to stir liquids in the furnaces and to clean the furnaces. At one end of the boom is a blade used for skimming, stirring or cleaning; the other end of

the boom attaches to a truck for operation of the boom. The heat of molten alloys damages the blade end of a skim boom very quickly. While estimates of the average life of skim booms vary, some of the evidence submitted shows that skim booms used in the south ingot facilities had to be repaired or replaced every two days, and that the cost of a skim boom manufactured in-house at the ALCOA plant ranged from $1,800.00 to $2,200.00.

One method used to repair or replace skim booms was to cut off the blade end of a skim boom as far back as the heat damage required, then to weld on to the remaining boom a new end with a replacement blade. Cost-cutting considerations suggested exploring methods of preserving and/or salvaging more of the material used in a skim boom, and reducing the amount of labor involved in cutting off the blade end of a used boom and attaching a new blade end to it.

At or soon after the fall 1992 meeting, the plaintiff Mr. Howell asked whether he could be involved in the project of designing a more efficient skim boom. The plaintiff asked this of both Mr. Vrablec and Paul Thomas, Mr. Vrablec's supervisor. These individuals indicated to the plaintiff that if Mr. Howell came up with a proposal, ALCOA would look at it.

Mr. Howell thought about the problem, and obtained permission from Ted Wilson, a supervisor of the plaintiff who in turn reported to Mr. Vrablec, to bring into the south ingot facilities an acquaintance of Mr. Howell to look at the skim booms then in use. This acquaintance of Mr. Howell was not an employee of ALCOA; he provided assistance to Mr. Howell in drawing a proposed skim boom according to Mr. Howell's idea.

By late 1992, the plaintiff had prepared in his shop at his home a wooden model of his proposed skim boom. Through Ted Wilson, the plaintiff urged Mr. Vrablec to come to Mr. Howell's shop to see the model. On January 2, 1993, Mr. Vrablec and Mr. Wilson went to Mr. Howell's shop and viewed the model. The conversation which these three

men had at that time is important to the plaintiff's theories of recovery in this civil action, and so the court will describe this conversation more fully below.

At the conclusion of the January 2, 1993, visit to Mr. Howell's home shop, Mr. Vrablec told Mr. Howell that he, Mr. Vrablec, would next go to the purchasing department at ALCOA's Tennessee plant to discuss the possibility of ALCOA contracting with Mr. Howell for the manufacture of skim booms. It was expressed clearly that this was a sensitive issue. ALCOA's labor force at the Tennessee plant works under a collective bargaining agreement, and contracting out for the production of any item used in the manufacturing process might be perceived as taking work away from members of the bargaining unit.

During the period after the January 2, 1993, meeting at Mr. Howell's home shop, the plaintiff asked Mr. Wilson and Mr. Vrablec about the subject from time to time, when he saw them at work. Neither gave the plaintiff a definite answer. About 10 months after the January meeting, Paul Thomas, Mr. Vrablec's supervisor, told Mr. Howell that ALCOA would not deal with him for the production of skim booms, because of the concern about contracting out for this work. On December 16, 1993, the plaintiff saw a skim boom in use at the south ingot facilities which he says so closely resembled his design that the idea for it must have come from him. Believing that his idea for an improved skim boom had been stolen from him and given to ALCOA, the plaintiff began to investigate, and, later, commenced this civil action.

The plaintiff secretly tape-recorded many of the conversations which he had with other employees of ALCOA concerning an improved design for a skim boom. He tape-recorded his January 2, 1993, meeting with Mark Vrablec and Ted Wilson, and the transcript of this recording [doc. 21, ex. C, *Transcription of an audiotape entitled "Mark, 1-2-93"*] establishes that no contractual agreement was made at that meeting.[1]

---

1. The plaintiff, having made these recording, moved *in limine* to exclude them or transcripts of them from trial [doc 57], to which the defendant responded in opposition [doc. 79], to which the plaintiff in turn replied [doc. 85]. While this

motion *in limine* does not refer to the defendant's use of the transcripts in support of its motion for summary judgment, the court will address briefly the plaintiff's objection. The de-

In fact, the transcript shows that Mr. Vrablec made it evident to Mr. Howell that he, Mr. Vrablec, did not have the authority to enter into the contract which Mr. Howell sought. Mr. Vrablec discussed with Mr. Howell the process of reaching some agreement with ALCOA in terms of "steps," one being determining whether the purchasing department would be willing to contract out for skim booms, and another being the obtaining of a price quotation from Mr. Howell for consideration [id. at 9, 11. 4–8, and 13, 11. 16–22]. Mr. Vrablec also mentioned ALCOA's concern about potential liability for any solid waste disposal in which Mr. Howell might engage as a contractor [id. at 16, 11. 13–23]. It is clear that Mr. Vrablec contemplated that there would not be any binding agreement between Mr. Howell and ALCOA until there was a written contract signed by the parties [id. at 17, 11. 18–24].

Mr. Vrablec's deposition testimony, also offered in support of the defendant's motion for summary judgment, is consistent with the transcript of Mr. Howell's recording of their January 2, 1993, conversation. Mr. Vrablec testified that he made it "very clear" to Mr. Howell "that it was very uncertain whether or not we would be willing to contract something like this out with him. But at least at this point, I felt like there was merit enough to investigate it" [doc. 21, ex. A at 75, 11. 19–23].

The plaintiff's own deposition testimony is not inconsistent with this. Mr. Howell testified that when he first approached Mr. Vrablec after the fall 1992 meeting about proposing a design for a more efficient skim boom, Mr. Vrablec responded, "If the savings was there, and I [i.e., Mr. Howell] could show that the savings was there, they [i.e., ALCOA] would certainly take a look at it" [doc. 21, ex. B at 22, 11. 16–18]. It is apparent that after the January 2, 1993, meeting at his

fendant offers the transcripts not to prove the truth of their contents (which consist to a great extent of self-serving declarations of the plaintiff), but to show what was *not* said during these conversations, *i.e.*, to show that no one tape-recorded by Mr. Howell either entered into an agreement with him on behalf of ALCOA or made any admission of liability on the part of ALCOA. As such, the transcripts are not hearsay under Fed.R.Evid. 801(c).

home shop, Mr. Howell assumed the existence of an agreement, but on the basis of something less than an offer and acceptance. For example, concerning the alleged agreement to keep confidential his design disclosed by the model in his home shop, Mr. Howell testified,

> Well, when he told me to keep a low profile, to bring a man in there to look at it, and not let them know what he's there for, everything else is in perspective, that you'd automatically keep your mouth shut, I would think. That's the way I took it. And that's exactly what I done.

[Id. at 45, 11. 8–13.] Mr. Howell could not recall at his deposition any agreement concerning a price term, the duration of any agreement to provide skim booms for use at ALCOA's Tennessee plant, or a quantity term [id. at 267–72]. He testified that he never submitted a bid to perform this fabricating work [id. at 269–71], no bid having been requested of him.

Much of the evidence submitted by the parties in support of and in opposition to the defendant's motion for summary judgment deals with the various designs of skim booms tested at ALCOA's Tennessee plant during the relevant time period, and with determining who, if anyone, might have disclosed the plaintiff's design to the defendant. Mr. Howell's design uses a male or inner sleeve at the site where the blade end and the truck end of the boom are joined. In this sense, Mr. Howell's design is a three-piece design, consisting of the two pieces of the boom and the sleeve. It is also properly called a two-piece design, in that the blade end is detachable, unlike a single-unit skim boom which must be cut and welded back together after its blade end is damaged. Mr. Howell proposed a pinning mechanism for joining the two pieces of his boom with the sleeve inside.

The plaintiff contends that the parties' transcriptions of these audiotapes differ, but he has not shown any significant differences which are material to this purpose. Having tape-recorded his conversations with several individuals, and having failed to elicit from any of them what he so obviously wanted to hear, the plaintiff's claim of unfair prejudice under Fed.R.Evid. 403 fails. In any event, the court concludes that the defendant is entitled to summary judgment in this case whether these transcripts are considered or not.

It is the use of a male sleeve which distinguishes the plaintiff's design from other skim booms with which he is familiar. Of less importance is the fact that the plaintiff's design uses collector plates to prevent molten metal from "freezing" the joint at the site of the sleeve so that the blade end cannot be disconnected from the truck end.

> Q. What's the idea that ALCOA allegedly stole from you?
>
> A. It's the sleeve in the skim boom.

[Doc. 21, ex. B at 18, 11. 9–11.]

> No. [ALCOA's version has] not got the bracing mine has on it. They stole the sleeve. They didn't—everything else is theirs. The sleeve, the interchangeable part, and the collector plates on the side of that boom is my idea.

[*Id.* at 48, 11. 12–16.] [2]

Mr. Howell, apparently anticipating a risk of theft of his design, and anticipating also a contract to supply skim booms to his employer, never made a full disclosure of his design. He held back "the 2 percent it takes to make it work," an aspect of the design intended to keep molten metal out of the tubular boom [*id.* at 69, 11. 13–25].

When Mr. Vrablec reviewed Mr. Howell's model at the plaintiff's home shop, Mr. Vrablec did not pay enough attention to the details of the model to know whether the design used a detached inner sleeve [doc. 21, ex. A at 99, 1. 25, and 100, 11. 1–5]. According to Mr. Vrablec, during the time period after the crew meeting at which he discussed cost-cutting, ALCOA tested another skim boom made of a ceramic material named Sifca, which was provided by a manufacturer other than ALCOA because of its non-metallic composition [*id.* at 44–48]. Ted Wilson testified at his discovery deposition that at about the time when Mr. Howell complained that his design had been copied without his permission, in December 1993, "there was a Sifca boom showed up that was very similar to [the plaintiff's]" [doc. 44, app. II, ex. 3 at 33, 11. 2–4]. This Sifca boom used a sleeve, with the two ends fitting over the sleeve, connected by pins [*id.* at 33, 11. 22–25, and

34, 11. 1–3]. Furthermore, according to Mr. Wilson, there were present at the Tennessee plant during this time period one or more steel booms which were "very similar" to Mr. Howell's design, although the design of these booms might have had the male sleeve attached to one end of the boom [*id.* at 34–36]. Mr. Wilson could not recall whether the connector on the Sifca booms "was a sleeve or whether it was a built-in part of it" [*id.* at 37, 11. 15–18].

Another skim boom design tested at ALCOA's Tennessee plant is called the Massena boom, because it was derived from a design used previously at ALCOA's Massena plant. Glenn Blankenship, an ALCOA maintenance technical specialist, "incorporated a skim boom design from one of our sister locations to fit our applications here in Tennessee" in early 1994 [doc. 44, app. II, ex. 9 at 22, 11. 6–14]. Mr. Blankenship learned of the Massena boom from Ken McMillen, a metallurgical engineer who had gone to Massena to view the design [*id.* at 22, 11. 17–23]. At the time, Mr. Blankenship was assisting another technical specialist, Jack Walker, who worked regularly in the ingot facilities where Mr. Howell, Mr. Vrablec, Mr. Wilson and others worked, and who was experiencing illness [*id.* at 23, 11. 17–23]. According to Robert L. Brim, the now-retired area maintenance superintendent for the ingot and can reclamation facilities at ALCOA's Tennessee plant! who supervised Mr. Walker and worked with him on skim boom efficiency during 1992 through 1994, Mr. Walker did not work on a two-piece skim boom during this time period other than the Sifca boom, to Mr. Brim's knowledge [doc. 44, app. II, ex. 9 at 13, 11. 24–25, and 14, 11. 1–24].

The modified Massena boom on which Mr. Blankenship worked consists of a smaller tube, the blade end, which fits inside a larger one, the truck end, with a pin which penetrates both tubes at the joint, held in place by a cotter key [doc. 44, app. II, ex. 6 at 42, 11. 2–9]. The smaller tube is stabilized inside the larger one by plates tapered and welded inside the larger tube [*id.*, 11. 10–19].

---

**2.** By its memorandum and order filed on July 19, 1996 [doc. 15], the court allowed the defendant to amend its answer to change certain references to "skim boom sleeves" to references to "skim booms." The court noted [*id.* at 2] that with the amendment, the defendant denied that it used a skim boom with a sleeve.

In modifying the design which came from the Massena plant, Mr. Blankenship "replaced [a] two-piece bolting arrangement with a pin that passed through both the tube, the two pieces of tubing, and then a cotter key went on each end" [*id.* at 74, 11. 8–11].

Brett McBrayer, an ALCOA area coordinator, began working on the problem of the cost efficiency of skim booms in mid- to late 1994, at Mr. Vrablec's direction. Mr. McBrayer worked on this project with Ken McMillen, the metallurgical engineer, and Mr. Blankenship. The only design on which Mr. McBrayer worked was the modified Massena design:

> [I]t had a large end that fit into the truck, and then a smaller piece that slid into that large end. Had a pin that dropped through that to hold the two together. And then on that smaller piece of steel, which slid into the larger piece of steel, it had a blade on it.

[Doc. 44, app. II, ex. 10 at 23, 11. 20–25, and 24, 1.1]. Mr. McBrayer, in the latter part of 1994 and in 1995, worked on obtaining evaluations from employees who were using skin booms of this design [*id.* at 25–27]. Mr. McBrayer testified that most employees at ALCOA's Tennessee plant whom he encountered continued to prefer the older, single-unit skin boom design [*id.* at 28 and 29, 11. 1–5].

Greg Gibson worked under Ted Wilson during the relevant time period as a shift supervisor in Mr. Wilson's crew [doc. 44, app. II, ex. 3 at 12, 11. 7–11]. Mr. Gibson, in working on skim boom design, came up with a design in which

> [t]here would be a long piece of the boom that stayed in the truck. It would—and I don't know lengths or anything. But it would come down and it would have a collar that tapered down to where it would fit inside the short piece, and one pin going through it, to where when the blade wore out in the end down where it was in the molten metal, all you had to change was just the short section with the blade on it. The other piece would stay on the truck all the time.

[Doc. 44, app. II, ex. 8 at 14, 11. 24–25, and 15, 11. 1–9.] Mr. Gibson's design was not successful in application [*id.* at 16, 11. 3–15]. When Mr. Howell made the accusation that ALCOA had stolen his idea, Mr. Gibson testified that he stated to Mr. Howell, " 'Look, Bob,' I said, 'I thought I come up with the idea of the two-piece skin boom.' because I didn't even know what his design was, what he was working on" [*id.* at 44, 11. 17–25, and 45, 11. 1–2].

With respect to the issue of whether someone might have disclosed Mr. Howell's design to ALCOA, Ted Wilson recalled an informal meeting in the summer of 1993 at which he and other employees, Jack Cox, Buster King, and David Hatcher, discussed the design of a skim boom. Mr. Wilson sketched a design as Mr. Cox described it. Mr. Wilson "realized that it began to look at least the same basic idea as what Bob [Howell] was working on" [doc. 44, app. II, ex. 3 at 42, 11. 2–4]. For this reason, Mr. Wilson threw away his sketch [*id.*, 11. 5–8].

The taped May 21, 1995, conversation between the plaintiff and Mr. Wilson indicates that Mr. Wilson sketched an idea described by Buster King, not Jack Cox [doc. 21, ex. C, *Transcription of an audiotape entitled "Ted Wilson."* at 5–7]. Buster King had seen the plaintiff's model at the plaintiff's home shop in the spring of 1993 [*id.* at 9; doc. 21, ex. B at 36]. Mr. King denies that he divulged any information about Mr. Howell's design [doc. 21, ex. C, *Transcription of an audiotape entitled "Buster King."*, passim ].

The affidavit evidence submitted by the defendant with its reply [doc. 46] to the plaintiff's response to the defendant's motion for summary judgment renders the defendant's evidence in support of its motion more coherent.[3] Mr. Walker, the senior mechanical technical specialist on sick leave from ALCOA since mid–1996, states in his affidavit [doc. 46, ex. B] that in 1992 and 1993, he developed a design for the Sifca boom in cooperation with Wahl Refractories, Inc.; that this was a two-piece design using a

---

**3.** By its order filed on November 7, 1996 [doc. 56], the court denied the plaintiff's motion to strike the defendant's reply brief.

blade end "cast of a material called 'Sifca,' a patentable, castable reinforced ceramic matrix" [*id.* at 2]; and that "[t]he shorter blade end was attached to the longer adapter end of the boom by a sleeve made of a smaller diametric tubing, which fit inside the adapter end of the boom and was held in place by a pin fitted into aligned holes in the adapter and the sleeve" [*id.*]. In the fall of 1993, Mr Walker designed a similar two-piece skim boom "constructed wholly out of steel rather than Sifca and steel" [*id.*]. ALCOA fabricated twelve of these for experimentation, but they were no more popular with the laborers who used them than the Sifca skim boom had been, and so Mr. Walker's experimentation with the design ceased in mid–1994 [*id.*].

Mr. Walker's "two-pieced, sleeved steel skim boom design" evolved from his work on the Sifca boom, and was influenced also by "a number of earlier two-pieced, sleeved designs" which he reviewed in developing his design [*id.*] Mr. Walker did not get his ideas for either the Sifca or his all-steel skim boom from Mr. Thomas, Mr. Vrablec, Mr. Wilson, Mr. King, Mr. Gibson, Mr. Blankenship or the plaintiff [*id.* at 3]. Mr. Walker states plainly, "The concept of inserting and pinning a sleeve into two pieces of metal tubing is not a novel or original one; it is a standard engineering method of piecing tubing or pipe together. Nor is the concept of a two-pieced skim boom novel or original" [*id.* at 4]. The affidavit testimony of Gregory D. Gibson [doc. 46, ex. C] is consistent with this.

That there was at least one earlier design for Mr. Walker to consider is established by the deposition testimony of Charles Farmer, III [doc. 46, ex. E], a senior designer who designed a skim boom for experimental use in the north ingot facilities of the Tennessee plant, as opposed to the south ingot facilities in which Mr. Howell worked. In 1978, Mr. Farmer designed a two-piece skim boom in which "[t]he end of the boom with a short segment on it was slid into a socket, over a socket, and a couple of bolts put in it to make it removable—replaceable" [*id.* at 8]. Use of this design was discontinued because it was not practical [*id.* at 10]. After 1978, Mr. Farmer knew that Mr. Walker was "making sketches and doing trials," and the two had informal conversation without discussion of any details of the 1978 design [*id.* at 11].

The parties do not dispute that the substantive issues in this diversity action are governed by Tennessee law, all of the dealings between the plaintiff and the defendant having occurred here. 28 U.S.C.A. § 1652; *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Tennessee choice-of-law rule "that the law where the contract was made controls absent a contrary intent," *Davis v. Sears, Roebuck and Company,* 873 F.2d 888, 893 (6th Cir.1989) (citation omitted), calls for the application of Tennessee law in this case, for if a contract was made at all, it was made by the parties here.

■ Procedural matters in this court are, of course, governed by federal law, and specifically, summary judgment procedure is governed by Fed.R.Civ.P. 56. *Schultz v. Newsweek, Inc.,* 668 F.2d 911, 917 (6th Cir. 1982). While the modern standards applicable under Rule 56, *see, e.g., Street v. J.C. Bradford & Company,* 886 F.2d 1472 (6th Cir.1989), are well known, the parties' arguments concerning their respective burdens requires the court to devote some attention to this issue. It is true, as the plaintiff argues, that the court must "consider all facts and inferences drawn therefrom in the light most favorable to the nonmoving party," *City Management Corporation v. U.S. Chemical Company, Incorporated,* 43 F.3d 244, 250 (6th Cir.1994) (citations omitted) (discussing *de novo* appellate review of a district court's grant of summary judgment). However, as the quoted language indicates, this applies only to facts and inferences drawn from facts; the plaintiff cannot rely on mere allegations and inferences drawn from those allegations. This is in keeping with the language of the rule itself; Rule 56(e) provides in part,

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

A party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact, a burden which it can meet by "pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir.1996) (*citing Street v. J.C. Bradford & Company, supra*). Once this burden is met, the opponent of the motion, such as the plaintiff in this case, cannot rely on the hope that the trier of fact will disbelieve a denial of a disputed fact; instead, the opponent, to defeat a motion for summary judgment properly supported, must present to the court affirmative evidence. *Id.* This is the duty of the opponent of the motion; "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.*

The plaintiff Mr. Howell argues that the court must draw inferences from the facts of record that favor him [doc. 44 at 3], and that "ALCOA does not deny in its Memorandum that it stole Plaintiff's idea, that it used Plaintiff's idea, and that it breached its contract and confidential relationship with the Plaintiff" [*id.* at 5]. The plaintiff argues, "ALCOA does not discuss [these issues] because it knows that these issues are genuinely in dispute and must be decided by the jury" [*id.*]. As "the clearest example" in support of his argument, the plaintiff points [*id.* at 5–6] to his own testimony that he saw two-piece, sleeved skim booms similar to his design at the ALCOA plant in December 1993; this, he says, shows the existence of a genuine issue of fact concerning whether ALCOA stole and used his design of a skim boom.

ALCOA has denied throughout this litigation that it stole anything from Mr. Howell. The defendant denies that it uses a sleeved, two-piece skim boom, and the evidence reviewed above shows ALCOA's position to be that to the extent that it experimented with such a skim boom, it did so using designs from sources other than the plaintiff. The defendant clearly denies any breach of contract because it denies that there ever was a contract, and denies any breach of a confidential relationship for a similar reason. The plaintiff cannot avoid dismissal under Rule 56 simply by arguing what the defendant has not denied in its brief; instead, the defendant having made and supported a motion for summary judgment as provided in the rule, the plaintiff must present evidence sufficient to show that a trier of fact might legitimately find in his favor under one or more of the theories on which he relies.

The plaintiff sues in this civil action under three theories, breach of an implied contract, breach of a confidential or fiduciary relationship, and quasi contract or unjust enrichment. Concerning the first theory, the plaintiff states in his proposed pretrial order [doc. 43 at 6]:

By the conduct of soliciting the idea from Howell; by the conduct of reviewing the idea and expressing the approval of the idea; and by assuring Howell that he would have the opportunity to make the sleeve for the skim boom; Alcoa created an implied contract with Howell for the development of the idea and under which Alcoa would be allowed to use the idea. Since the sleeve embodies a novel idea and product, the provision of idea for the sleeve to Alcoa constitutes valid consideration for the contract. By the subsequent use of the sleeve for the skim boom without Howell's permission and without compensating Howell, Alcoa breached the contract with Howell.

A contract implied in fact, as opposed to one implied in law, is found where the circumstances, considered in light of the ordinary course of dealing and of common understanding, justify a finding of mutual intent to make a binding agreement. *Paschall's, Inc. v. Dozier,* 219 Tenn. 45, 50–51, 407 S.W.2d 150, 153–54 (1966). An implied contract is generally found on the basis of conduct instead of words; the issues presented by a claim under the theory are whether a reasonable person in the shoes of the plaintiff would have been justified in inferring that the defendant had made an offer or promise, and whether the defendant, upon receiving the benefit of the plaintiff's services, knew or reasonably should have known that the plaintiff expected some compensation in consideration of those services. *Cummins v. Brodie,* 667 S.W.2d 759, 764 (Tenn.Ct.App.1983),

*perm. app. denied, id.* (Tenn.1984). An implied contract may be found where "one party does work for another, the other knew about the work, the work was useful and would normally be done for pay, and the other does not object or accepts the work." *Id.* (citation omitted). "The words or conduct of the party receiving the work must lead the worker to infer a promise to pay." *Id.*

After a full opportunity for discovery, the plaintiff has failed to come forward with evidence sufficient to show a genuine issue of fact concerning the existence of an implied-in-fact contract in this case. Without dispute, the evidence in the record shows that Mr. Howell volunteered to design a more efficient skim boom. ALCOA did not seek Mr. Howell's services, which is shown plainly by the fact that Mr. Howell, once he had completed his model of a skim boom, had to extend several invitations to Mr. Vrablec through Mr. Wilson to come to the plaintiff's home shop to see the model.

Mr. Vrablec's deposition testimony that he, after viewing the model, made no promise or offer other than to pursue through proper channels at ALCOA's Tennessee plant whether the defendant might be interested in contracting with the plaintiff is supported fully by the plaintiff's own deposition testimony. Mr. Howell's testimony that "[i]f the savings was there, and I could show that the savings was there, they would certainly take a look at it" does not indicate even an agreement subject to a contingency; it indicates only an agreement to consider a proposal ("take a look at it") if a contingency ("I could show that the savings was there") were met.

The ordinary course of dealing and common understanding weigh heavily against Mr. Howell in this regard. The undisputed evidence shows that ALCOA tested or considered several designs of two-piece skim booms, with little success in convincing the workforce where Mr. Howell worked to prefer any of them over the single-unit design which had been used for some time. The plaintiff asks the court to imply mutual assent to use Mr. Howell's design or to engage Mr. Howell as a contractor for the fabrication of skim booms (the plaintiff's statement of his factual allegations in this regard has changed during the course of this litigation)

in the absence of any evidence that ALCOA tested his design to determine its efficiency and acceptability. This is not reasonable under the circumstances.

The parties have devoted discovery and argument in this case to the issues whether ALCOA gave formal consideration to contracting out with Mr. Howell, and whether ALCOA, during the relevant time period, contracted out for other items which bargaining-unit employees might have fabricated. Viewed in the light most favorable to the plaintiff, some of the evidence in the record shows that management unilaterally decided in this case not to submit any proposal concerning Mr. Howell's design of a skim boom to the joint labor-management committee which considered contracting-out issues, and that any guidelines which determine the scope of this committee's jurisdiction are less than clearly stated. This is irrelevant, however. ALCOA ultimately communicated to Mr. Howell that it did not wish to deal with him because of the contracting-out issue. Whether or not the contracting-out issue truly prevented the defendant from making any binding agreement with the plaintiff, ALCOA had the right as a matter of law to decline to deal with Mr. Howell, no binding promise or agreement having been made up to that point. Put another way, in the absence of an implied or express contract, whether ALCOA's stated reason for declining Mr. Howell's proposal was pretextual is not an issue which the court must reach.

Whether ALCOA exercised poor corporate judgment in declining to deal with Mr. Howell, and whether the defendant displayed a lamentable lack of business courtesy in failing to give Mr. Howell a direct response to his inquiries for a period of about 10 months, are likewise irrelevant. A corporation or individual is always free to reject a good idea. Mr. Thomas' and Mr. Wilson's deposition testimony concerning the failure to respond to the plaintiff's inquiries are not admissions of liability on behalf of the defendant, but merely expressions of recognition of the fact that the defendant could have treated an enterprising employee with much more grace.

The plaintiff states in his proposed pretrial order that because of the novelty of his design, his disclosure of it constituted valuable

consideration, entitling him to be paid upon the defendant's use of it. This argument applies to the case whether the alleged implied contract was one for fabrication of skim booms, or one to provide an idea.[4] The deficiencies in the argument are that the plaintiff disclosed nothing novel, and that the defendant did not make use of the design he did disclose.

Mr. Walker's affidavit testimony that inserting and pinning a sleeve into two pieces of tubing is "a standard engineering method of piecing tubing or pipe together" is conclusive, unrefuted evidence concerning the absence of novelty. While the plaintiff might have been able to argue that an inference of use of his design could be drawn from his having seen skim booms similar to his design at the south ingot facilities, the inference has been destroyed by, *inter alia*, the evidence that Mr. Walker designed the Sifca skim boom without reference to Mr. Howell's design, that Mr. Walker then had some all-steel skim booms fabricated using the Sifca skim boom design, and that in performing his work, Mr. Walker used at least one design for a two-piece skim boom which dated from the late 1970s. This evidence is uncontroverted, and all that Mr. Howell can offer in opposition to it is the assumption that if ALCOA had possessed a pre-existing design for a cost-saving two-piece skim boom, "common sense tell you they will exhaust all other places with that kind of money to be saved before they would come to my house" [doc. 21, ex. B at 110, 11. 11–13], and unsupported speculation that drawings were backdated [*id.* at 166, 11. 12–25, and 167, 11. 1–13].

In short, after an adequate opportunity for discovery, the plaintiff has not placed into the record evidence on the basis of which a trier of fact might find facts or reasonable inferences from facts justifying a conclusion that these parties in fact had a contract for anything. Just as in *Van Rensselaer v. General Motors Corporation*, 223 F.Supp. 323, 329 (E.D.Mich.1962), *affirmed*, 324 F.2d 354 (6th Cir.1963), *cert. denied*, 377 U.S. 959, 84

S.Ct. 1640, 12 L.Ed.2d 502 (1964), a case in which the plaintiffs offered unsolicited suggestions to the defendant manufacturer for certain improvements to automobiles, "[t]he difficulty with [the] implied-in-fact contract theory is that the contract implied-in-fact requires an actual agreement between the parties, just as does the express contract, the implied-in-fact contract being manifested, however, by acts and conduct rather than by express words." And just as in *Van Rensselaer*, the defendant's rejection of an express contract makes it very difficult to argue that any contract came into being. *Id.* In the absence of evidence that ALCOA solicited Mr. Howell to submit a design of a skim boom, the authorities on which the plaintiff relies, such as *Yadkoe v. Fields*, 66 Cal. App.2d 150, 151 P.2d 906, 63 U.S.P.Q. 103 (1944), provide no argument against granting the motion for summary judgment.

■ Just as there is no evidentiary ground for implying mutual assent by these parties to the agreement which Mr. Howell claims existed, so there is no basis for holding ALCOA bound by promissory estoppel as if it had entered into a contract with the plaintiff. In *Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn.1982) (citations omitted), the Tennessee Supreme Court described promissory estoppel as arising out of a substantial change of position undertaken by a plaintiff in reasonable reliance on a gratuitous promise; the defendant promisor is held estopped to deny enforceability of the promise to the extent necessary to avoid an unjust result. In the case at bar, the promise to "take a look at it," the only promise which the evidence in the record shows, cannot be held to have justified a reasonable belief that the plaintiff had a contract to supply either a design or fabricated skim booms to the defendant. Otherwise, every issuer of a solicitation for bids would be held bound to every bidder which expended substantial resources in preparing a bid or proposal, and to every bidder which decided to forgo other business opportunities while preparing its bid or proposal.

---

4. All of the evidence submitted by the parties, including the plaintiff's evidence submitted in opposition to the motion for summary judgment, shows that the plaintiff believed he had a contract to fabricate skim booms, not to sell a design, until this litigation was underway. Otherwise, the plaintiff's allegations about forgone opportunities for his home shop business [*see, e.g.,* doc. 44, app. II, ex. 1, *Affidavit of William R. (Bobby) Howell*, para. 13] would make little sense.

Proof that Mr. Howell did forgo other business opportunities at the inducement of the defendant while he was waiting to hear whether ALCOA's purchasing department might contract out with him is nonexistent in this record. There is no evidence that AL-COA did anything to prevent the plaintiff from presenting his design for a skim boom to other manufacturers who might have had a use for it, that ALCOA prevented the plaintiff from seeking protection under the patent laws for his design, or that ALCOA discouraged Mr. Howell from performing any other remunerative work in his home shop. The plaintiff's claim for damages for income which he did not realize from metal sculpting in his home shop rests on pure speculation:

Q. Did you ever make $20,000.00 a year from your home business in your sculpting shop?

A. I never got started.

Q. You never got started?

A. Never got started.

Q. And why is that?

A. I wrapped up all my thoughts in these skim booms.

Q. So your mind was preoccupied? You were thinking about other things; is that what you're saying?

A. When he [i.e., Mr. Vrablec] had that meeting and he told me I could get involved, that's when I focused on the skim booms.

Q. Instead of working on other things?

A. Right.

Q. So you had never made twenty or $30,000 in any one year, not anywhere near close?

A. Right. I hadn't got started, but that's estimated.

Q. This is what you think you would have made if you had gone into this business?

A. I would have tried to do that or better. Who knows? I don't know.

[Doc. 21, ex. B at 265, 11. 6–25, and 266, 11. 1–4.]

█ Given the uncontroverted facts in this record, the plaintiff fares no better under his theory of breach of a confidential or fiduciary relationship. The plaintiff has not submitted to the court any authority for the proposition that such a relationship arises, without more, out of the employment relationship. In fact, it makes less sense to argue that ALCOA owed some fiduciary obligation to Mr. Howell in this case than in the ordinary employee-employer case, because to the extent that the plaintiff worked as the defendant's employee, the relationship was governed by a collective bargaining agreement, and to the extent that the plaintiff sought to fabricate skim booms for the defendant, the plaintiff sought to establish an arm's-length relationship with ALCOA as one of its independent contractors.

█ A confidential relationship arises (or, more accurately, is found to exist) when there is dominance and superiority on the part of one party due to such elements as a close family relationship, a long-continued practice of entrusting business matters to a confidant, or differences in age, health or education. *Chisholm v. Western Reserves Oil Company*, 655 F.2d 94, 97 (6th Cir.1981) (*citing* Bogert, TRUSTS § 86 at 315–16 (5th ed.1973)). There is no such evidence here on the basis of which to find a confidential relationship. Viewing the evidence in the light most favorable to Mr. Howell, there is evidence that Mr. Vrablec and Mr. Wilson understood that they were not to divulge the design disclosed to them when they viewed the plaintiff's model, but in the absence of any evidence stronger than speculation that they did divulge what they had seen, there is hardly an actionable breach of a confidential relationship in this case. As the court's discussion of the law of trusts in *Chisholm, supra,* makes clear, a confidential relationship involves much more than an obligation to keep a secret.[5]

**5.** In awarding a summary judgment of dismissal of the plaintiff's claim under the theory of breach of a confidential relationship, the court understands that this is not a patent infringement case, and that the plaintiff therefore need not prove as an element of his claim for relief for the alleged misappropriation of his design under this theory that his design was novel, unique and not obvious. *See A.O. Smith Corporation v. Petroleum Iron Works Co. of Ohio*, 73 F.2d 531, 538–39 (6th Cir.1934), *opinion modified and rehearing denied,*

Finally, the court finds that the plaintiff has failed to show the existence of any genuine issue of fact which might entitle him to recover under a theory of *quantum meruit* or unjust enrichment. A quasi contract, or contract implied in law, is found to exist regardless of the assent of the party to be bound when reason and justice require the imposition of a contractual relationship. *Paschall's, Inc. v. Dozier, supra,* 219 Tenn. at 50–51, 407 S.W.2d at 153–54. The elements of a quasi contract are "[a] benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance of such benefit under such circumstances that it would be inequitable for [the defendant] to retain the benefit without payment of the value thereof." *Id.* at 155.

In circumstances such as those presented by this case, novelty of the plaintiff's design or idea is an element of the plaintiff's case under the theory of unjust enrichment. *Van Rensselaer v. General Motors Corporation, supra,* 324 F.2d at 355 (citation omitted). The reason for this distinction between a claim in *quantum meruit* and one for an alleged breach of a confidential relationship (*see supra* n. 5) is obvious: in the absence of a requirement of proof of novelty, one could, simply by divulging one's design or idea to another, impose on the other an obligation to pay for something which was obvious. Even if Mr. Howell does not have a burden of showing novelty, however, the court finds as a matter of law that he has failed to present evidence from which a trier of fact might find that he conferred his design on ALCOA, or that ALCOA accepted any design from the plaintiff.

The court's conclusions stated in this memorandum opinion render it unnecessary to address other issues submitted by the moving defendant, such as whether the plaintiff's claim for relief under one or more of his theories is barred by the Tennessee version of the Statute of Frauds.[6] For the reasons stated, the court will enter an order granting the defendant ALCOA's motion for summary judgment and dismissing this civil action.

### ORDER

For the reasons stated in the court's memorandum opinion filed with this order, the

---

74 F.2d 934 (1935); *but see Kewanee Oil Company v. Bicron Corporation,* 416 U.S. 470, 476, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) (footnote omitted) (in the law of trade secrets, "some novelty will be required if merely because that which does not possess novelty is usually known"). The court simply finds as a matter of law that the plaintiff has not presented any evidence from which a trier of fact might find that there was a confidential relationship in this case, or that the defendant misappropriated the plaintiff's design.

6. The court decides that the defendant's motion for summary judgment should be granted with full awareness of the fact that the plaintiff continues to seek discovery in this civil action. The defendant objected to the plaintiff's attempted discovery of Stowers Machinery Corporation (Stowers) and JBM Incorporated (JBM) in a motion to quash or for a protective order filed on October 29, 1996 [doc. 52]. Soon after the plaintiff issued trial subpoenas *duces tecum* for Stowers and JBM [docs. 65 and 66], ALCOA moved *in limine* to exclude any evidence obtained from nonparties after the close of discovery [doc. 69]. The plaintiff responded to the motion to quash [doc. 74], and the defendant supplemented its motion *in limine* [doc. 75]. The plaintiff moved to enforce its subpoenas *duces tecum* [doc. 87 and 88], Stowers moved to quash [doc. 99], and a great deal of briefing from all sides accompanied these motions. On December 19, 1996, at the request of the under-

signed, United States Magistrate Judge Thomas W. Phillips heard the arguments of counsel concerning this dispute, and then took the matter under advisement pending the undersigned's consideration of the substantive issues presented by the defendant's motion for summary judgment.

As the court has noted above, whether or not contracting out and organized labor considerations in general truly prevented ALCOA from dealing with Mr. Howell is irrelevant; ALCOA chose not to contract with the plaintiff. The extent to which Stowers and JBM fabricate or have fabricated items for use at ALCOA's Tennessee or other plants, and the kinds of items which these entities have fabricated for ALCOA, are therefore likewise irrelevant. Even if Stowers or JBM have worked on skim booms or designs of skim booms for ALCOA, this cannot change the uncontroverted facts that the defendant was in possession of at least one design of a two-piece, sleeved skim boom before the plaintiff exhibited his model, that the defendant did not misappropriate the plaintiff's design, and that the defendant does not use the plaintiff's design. In short, granting the plaintiff the full scope of the discovery sought by him from Stowers and JBM could not change the outcome in this case, and the request for this discovery therefore should not be an impediment to granting the defendant's motion under Fed.R.Civ.P. 56.

court finds the defendant's motion for summary judgment [doc. 21] well taken, and it is **GRANTED.** It is **ORDERED** that this civil action is **DISMISSED.**

The other pending motions in this civil action are **DENIED** as moot.