IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
_____

**SOUTHERN TIN COMPRESS CORP.,**
**A Tennessee Corporation,**

    Plaintiff-Appellee,

Vs.

**MARK HILLER An Individual**
**Resident of Tennessee;**
**R. L. GOODNER An Individual**
**Resident of Tennessee;**
**QUALITY MARINE SERIVCE, INC.**
**A Tennessee Corporation;**
**HORIZON PRODUCTS UNLIMITED**
**CO., INC., A Tennessee Corporation,**

    Defendants-Appellants.

Shelby Chancery No. 101141-3
C.A. No. 02A01-9709-CH-00234

FILED

**July 10, 1998**

**Cecil Crowson, Jr.**
Appellate Court Clerk

_____

FROM THE SHELBY COUNTY CHANCERY COURT
THE HONORABLE D. J. ALISSANDRATOS, CHANCELLOR


John R. Branson, Anthony Sammons
Branson & Bearman of Memphis
For Plaintiff-Appellee

Charles A. Sevier
Sevier & Phillips of Memphis
For Defendants-Appellants


*AFFIRMED AND REMANDED*

Opinion filed:




                                                    **W. FRANK CRAWFORD,**
                                                    **PRESIDING JUDGE, W.S.**


**CONCUR:**

**ALAN E. HIGHERS, JUDGE**

**HOLLY KIRBY LILLARD, JUDGE**

        This appeal involves a suit for fraud.  Defendants, Mark Hiller, R. L. Goodner, Quality

Marine Service, Inc., and Horizon Products Unlimited, Co. Inc.,[1] appeal the trial court's judgment awarding plaintiff, Southern Tin Compress Corp., compensatory and punitive damages. Southern Tin contends that it was defrauded by the defendants out of more than $500,000.00 over a 28-month period. Southern Tin is a commercial dealer in scrap metal, and appellant Mark Hiller was a Southern Tin employee until 1992, when his role in the fraud with appellant R.L. Goodner was discovered.

Hiller was one of two "scale men" who worked for Southern Tin. In that capacity, Hiller was responsible for weighing and grading the scrap metal brought to Southern Tin by its customers. Under the common practice, the scale men would write a "scale ticket" for each transaction, which would include the type and weight of the metal, the customer's name and address, as well as the license number of the truck delivering the metal. Trucks bringing scrap metal to Southern Tin were weighed twice, once upon entry while fully loaded and again after the trucks had unloaded the scrap metal. The difference represented the weight of the scrap metal, which was recorded on the scale ticket by one of the scale men.

Typically, the customer would immediately take the scale ticket to Southern Tin's business office where Mary Hallock, the cashier, would input the information from the scale ticket into a computer and print a check for the amount of the purchase. The position of scale man is a trusted one because the scale man is often the only Southern Tin employee who examines the scrap metal prior to purchase.

On February 28, 1992, an anonymous caller, later identified as Larry Wade, called Southern Tin and alerted the company to the appellants' fraudulent scheme. Upon investigation, Southern Tin discovered that it appeared that Mark Hiller and Robert L. Goodner had been defrauding Southern Tin for over two years.

Barry Panitz, Southern Tin's general manager, retrieved all the scale tickets and checks written to Goodner. Over the course of 28 months, Goodner, through his agents, had made what was later determined to be fraudulent scrap metal sales to Southern Tin on 128 separate occasions. A scale ticket is required for every legitimate purchase of scrap metal and, as previously noted, there are two scale men at Southern Tin. However, in each of the 128

---

[1] The individual defendants were principals in the corporations, and both corporations were out of business at the time of trial.

fraudulent transactions, Hiller had written the scale ticket.  As Barry Panitz testified:

> Q: All right. What can you tell us about the handwriting on the tickets?
>
> A: In each instance, every ticket made out to R.L. Goodner were made out by Mark Hiller.
>
> ......
> Q: Are there any tickets in there where money was paid to R.L. Goodner where Mr. Hiller was not the scale man?
>
> A: No.

In some instances, checks had been issued to Goodner without a corresponding scale ticket, and in every such instance Southern Tin's cashier, Mary Hallock, had been absent from work, and Mark Hiller had assumed her responsibilities for the day.  Panitz testified:

> Q: Did you find any occasions where there was no scale ticket for a check?
>
> A: Yes, several.
>
> Q: Did you conduct an investigation as to how that might have happened?
>
> A: I did.
>
> Q: What did you find out?
>
> A: I noticed that on the days that there's no ticket of original entry and no, there's therefore no scale tickets, there were checks written when Ms. Hallock was absent and Mark Hiller assumed the duties of Ms. Hallock.
>
> Q: Did you make any investigations to determine if that was correct?
>
> A: That was correct.  We matched them with the days Ms. Hallock was absent.
>
> Q: Did you check Ms. Hallock's attendance records to find out?
>
> A: Yes, sir.

It is undisputed that five or six transactions with Goodner were legitimate.  In fact the first transaction between Southern Tin and Goodner, dated October 27, 1989, indicates a total purchase of $884.47, including 73 pounds of aluminum, 947 pounds of copper and 57 pounds of brass.  During the ensuing 28 months, 127 other transactions occurred between Southern Tin and Goodner.  During this time, Goodner supposedly sold Southern Tin more than 10 million pounds of scrap metal for which Southern Tin paid Goodner over $500,000.00.  Southern Tin's

records revealed that on some days, Goodner, through his agents, allegedly delivered 140,000 to 150,000 pounds of scrap metal. By way of reference, a fully loaded tractor trailer carries about 40,000 pounds fully loaded; therefore, Goodner would have had to deliver four tractor trailer loads of scrap metal to Southern Tin in one day in order to deliver 140,000 to 150,000 pounds of scrap. Panitz testified that only a large manufacturing company or another scrap company as large as Southern Tin could have generated such volumes of scrap and that no customer had ever delivered that much metal to the company in one day. Panitz testified:

> Q: Does it show on here [Exhibit 10] the total dollars of checks written to R.L. Goodner?
>
> A: Yes.
>
> Q: How much is that?
>
> A: Five hundred thousand, one hundred twenty-six dollars and fifteen cents.
> ......
> Q: How many pounds total does it show Southern Tin supposedly bought from R.L. Goodner?
>
> A: Total about ten million pounds, over ten million pounds.
> .......
> A: Okay. Nobody has access to this amount, this weight of steel, cast iron, stainless steel, on such a regular basis. Only the very largest industries in the City of Memphis, or in the State of Tennessee for that matter, other scrap yards besides myself or a brother or sister scrap yard related to our company could have these amounts. There's no other person could bring this amount of weight in.
>
> Q: Do you know any occasion where any individuals, other than another scrap yard or factory like you're talking about, would have done this volume of scrap volume in twenty-eight months?
>
> A: No.
>
> Q: You've got about ten and a half million pounds down here for material that was allegedly sold to Southern Tin by Mr. Goodner. Is that a lot?
>
> A: Tremendous.

The Memphis Police Department requires Southern Tin to note the license tag number of all trucks coming onto its site to deliver scrap metal. Of all the license numbers listed by Hiller on all 128 of the scale tickets, only one vehicle was registered to Robert Goodner. In fact, when asked about these various license numbers, Goodner testified:

> Q: An FDX 167 according to Sergeant Townsend is a 1987 Ford

4

pickup registered to Mrs. Goodner; is that right?

A: That was a Ford Bronco four-wheel drive, yes, sir.

Q: What about 0967 PY?

A: I am not sure.

Q: WZ 1642?

A: I have no idea.

Q: PY 0967?

A: I do not know.

Q: 0967 PT?

A: I don't know.

Q: PD 967 PY?

A: I don't know.

Q: JKL 883?

A: I have no idea what any of those numbers are or where they belong.

Q: WZ 1265?

A: I just testified that I did not only know my own tag number, but I don't know any of those numbers.

Sgt. Marvin Townsend is a twenty-three year veteran on the Memphis Police Department who also performs security work for Southern Tin. During the fraud investigation, Townsend ran searches on the license tag numbers that Hiller recorded on the scale tickets. Townsend testified as to his findings as follows:

Q: And what did your investigation reveal about those tag numbers?

A: Out of all of the numbers that were on there, one of them came back to Mr. Goodner, R.L. Goodner, I believe it was registered to....
......
Q: Take the first number down here in the lower left-hand corner. 0967 PY.

A: Yeah. I run that number, which appeared numerous times on the scale ticket. And that came back, never existed in Tennessee, Arkansas or Mississippi. Same as for PY 0967, 0869, PY --

Q: Hold on a second. I'll get to that. That first number 0967 PY, looking up and down through here, is that not the -- does that number appear overwhelmingly more often than the other?

5

A: Yes, it does.

......

Q: All right. Let's go to the next number you wanted to say a minute ago....

A: WZ 1642 it never existed either in Arkansas, Tennessee, or Mississippi.

Q: Okay. The next number is 0869 PY?

A: It was registered to a leasing company in Chattanooga, Tennessee.

......

Q: Did they [leasing company] have any business in the Memphis area?

A: No, they didn't.

Q: And did your investigation discover anything you knew about Leso [the leasing company], the way they do business?

A: I discovered from checking that this company was in Chattanooga, Tennessee and that it only leased these vehicles to businesses in the Chattanooga area and not individuals, for the purpose of insurance purposes.

Q: ... The next one of MT 8167.

A: It was on the 1987 Ford.

Q: Do you know who that was?

A: It's Charlotte Goodner.

Q: What about the next, looks like a variation maybe 0967 PY?

A: It never existed either. And the next one is PYZ 0967. It never existed. And the next one, 0967 PV, never existed. They used another number on the scale ticket, was GLR 270 was on a Plymouth Fairmont to a Daniel Free. And then another variation of that number, that number was used numerous times on the scale tickets which was 0967 PTY, the number that was used often and very often. It was altered, in my opinion, again, to P 9673 Y. It never existed. We went to another number on the scale tickets, that is YPL 883. It was registered to Yvette Mobley.

Q: What about the next one?

A: The next one WZ 1265. It never existed. And the final one was QFR 027. It was to a Robert Goodner on a '78 Chevy pickup. And the tag expired on it on 6/30/90 and it was never renewed.

Q: These scale tickets also that Mr. Panitz previously presented to you, they also had some addresses on them?

A: Yes.

6

Q: Did you investigate those addresses?

A: Yes. I looked at the tickets. Each ticket, these individuals who come in, they have to give their name, address, license plate number, that's how the license plate number got on the ticket. And Mr. Goodner's address appeared on the tickets earlier. And the rest of them was just, I didn't check into them because all of them was to the same guy, R.L. Goodner.

Q: So you just, did you discover that a couple of those -- what did you discover about a couple of those, were those true or --

A: Those were bogus addresses.

Q: They were bogus addresses?

A: Right.

At trial, Robert Goodner testified that either he or his agents would locate and haul scrap to Southern Tin. In fact, he testified that on one occasion he delivered 14,000 pounds of scrap metal to the scrap yard in a Camaro automobile. He stated on cross-examination:

Q: How much scrap did you get in a Camaro?

A: I didn't put much. I think one time I might have put a motor in the Camaro is what you can drag with the Camaro or the trailer that you can drag with the Camaro.

Q: How much were you dragging with that Camaro?

A: I drove fourteen thousand pounds with it one time.

Q: You towed fourteen thousand pounds?

A: Absolutely, because my front wheels were coming off the street when I pulled on the lot when Mark Curland helped me unload it.

Goodner testified that one of his agents was a man named Raymond Shorter. At trial, Goodner claimed to have used Shorter for only two or three months. However, Goodner was confronted with the following excerpt from his prior deposition testimony.

Q: ... Early on in that deposition I asked you I said, who drove the deliveries for you at Southern Tin? Page 9, you said Larry Wade, Raymond Shorter and he had three or four drivers. *I primarily went through Raymond.* He felt he wasn't getting his share of the process for quantities and felt like if he went through us with what he had as far as quantities he would get better prices, and he did. And I am not real familiar with some of the guys he uses as far as drivers.

      Do you remember that?

A: Yes, sir

Q: Okay, I asked you if you dealt with any of Raymond's people. All right. Do you remember that?

A: Yes, sir.

Q: I was asking you about how you paid this Raymond Shorter on Page 31, Counsel, Line 8. Did you pay him with checks or cash? I paid him with cash. Did you pay -- answer: He paid his drivers. I only dealt with Raymond. I thought I will keep asking about that, so I did. Do you remember?

A: Yes, sir.   (Emphasis added).

......
Q: ... Question: But nobody worked directly for you other than Wade and Shorter?  Answer: No, sir.  We didn't establish a company and, you know.  Question: I just want to know.  I don't want to hear about somebody at trial that I gave old Joe fifty bucks and he made a delivery.  I want to hear about them all. Answer: No, that is all.  That is all I am familiar with.  Who they used I don't know, you know, as it relates to different trucks, people or whatever.  Do you remember that?
......
A: Yes, sir, I do recall that.

......
Q: How much money did you pay Raymond Shorter?

A: I could only guess to how much money I paid Raymond Shorter.  Probably in the fifteen to twenty thousand dollars total.

......
Q: All right.  Well, now, if you don't know where Mr. Shorter lived and you don't know where his office was, and you don't know his phone number and you never knew any of those things, how did Mr. Shorter get his money?

A: He would call me and we would run through and meet. Sometimes he would meet me at the bank when he would call me and let me know there was a load that had been hauled in or a load coming in, and he would inform me of the type of metals. He would inform me of roughly how many loads.  He would inform me of the mileage back and forth because I was paying him 14 cents a mile for his gasoline.  And we were also paying him a premium for his labor, a small premium but we were paying him.

Q: He was like a subcontractor of yours?

A: Yes, sir.

Q: You paid him a check?

A: No, sir.  I did not pay him in check.  I paid him in cash so that he could pay for his expenses or in some cases actually the deal he had cut for the purpose of the scrap.

The first of the transactions under review occurred on October 27, 1989.  Goodner

testified that he primarily used Raymond Shorter to make the deliveries to Southern Tin. However, at trial Southern Tin introduced into evidence Raymond Shorter's death certificate establishing that Raymond Shorter had died on August 5, 1989, nearly three months before the first transaction even occurred. Therefore, Southern Tin proved that there was no way for Shorter to have made the deliveries in question as Goodner had claimed.

Goodner testified that Larry Wade was his only other agent. At trial, Wade testified that his job for Goodner was to pick up a check for Goodner at Southern Tin. In fact, when questioned about the services he provided to Goodner, Wade testified:

> Q: What did he [Goodner] ask you that he wanted you to do?
>
> A: To pick up a check for him.
>
> Q: Did you ask him what else was involved?
>
> A: He simply stated that he would like for me to, you know, pick it up for him.
>
> .......
> Q: ...Where did you go to pick up the check?
>
> A: Southern Tin Compress.
>
> Q: Is that where Mr. Goodner told you to go?
>
> A: Yes, it is.
>
> Q: Did he tell you what to do when you got to Southern Tin?
>
> A: Yeah. I was to go in and to the scales there and pick up a ticket and turn it into the lady that does the paperwork. And then she would fix up a check and put it in an envelope and gave it to me.
>
> .......
> Q: What would you do when you pulled into Southern Tin, and what did you do?
>
> A: I just pulled up front there, get out and walk in, and get their ticket, and turn right around and hand it to Ms. Mary. And she would make up the check and put it in the envelope and hand it to me with a piece of candy, and I was on my way.
>
> Q: Who did you see about getting the ticket?
>
> A: Mark Hiller.
>
> .......
> Q: How many times would you say it was?
>
> A: Well, it was probably, it was nearly a weekly thing. It went on for over a year that I know.

9

......

Q: Did you go by and pick up a check from Southern Tin to Mr. Goodner more than once a week?

A: There was probably a couple occasions where I went twice.

Q: Twice a week?

A: Yes, probably a couple different weeks I did.

Q: How did you find out each time you needed to go to Southern Tin for Mr. Goodner?

A: He would call me.

Q: Call you at the boat shop?

A: No. Usually it would be at home at night he would call.

Q: What did he say when he called you?

A: That I would need to go over and pick up a check for him.

Q: And how much was he paying you -- well, let me ask you this, how, basically, did he pay you? He paid you every time you went over there or by the week or what?

A: Yeah, usually two hundred dollars a week is what he was paying me.

Q: Did that make a difference whether you went there once a week or twice a week?

A: It didn't make any difference.

Q: But you got two hundred dollars a week from Mr. Goodner either way?

A: Yes, sir, that's right.

Q: Did you ever get paid two hundred dollars a week in which you didn't pick up a check for Mr. Goodner?

A: No, I didn't, I don't think.

......

Q: When you got to Southern Tin to pick up the scale tickets, were those tickets already ready or did you have to wait on them?

A: No. I never had to wait on anything. I had to wait in line behind some other people, but I never had to wait on the tickets.

Q: The tickets were filled out when you got there?

A: That's right.
.......

Q: So if I understand you right, you would go to Southern Tin and there would already be a ticket ready.

10

A: That's right.

Wade did testify that one day he had hauled two loads of scrap aluminum with a pickup truck and a small trailer. Otherwise, Wade testified that he never inspected any source for scrap on behalf of Goodner, never purchased or sold scrap for Goodner, and that neither he nor his agents ever made deliveries of scrap for Goodner. Furthermore, Wade testified that he never saw Goodner in possession of a truck that could haul 40,000 pounds of scrap metal, as Hiller's bogus scale tickets had indicated. Specifically, Wade testified:

Q: Did you ever go out and inspect a place that was supposed to have some scrap to look at for Mr. Goodner?

A: Nothing else to do with the scrap metal business.

Q: Did you ever go out and negotiate with anybody about buying scrap on behalf of Mr. Goodner?

A: No, I didn't.

Q: Did you ever go out and arrange other people to drive scrap for Mr. Goodner?

A: No, I didn't.

Q: Did you ever see Mr. Goodner in possession or control of any vehicle that would haul forty thousand pounds of scrap metal?

A: No.

Mary Hallock was Southern Tin's cashier throughout the relevant time period. She testified that on the morning of February 28, 1992, she received two anonymous telephone calls at Southern Tin. Through her dealings with customers, Hallock was familiar with Southern Tin's regular customers and was able to recognize them from both voice and sight. She testified that she recognized the caller as Larry Wade when he made reference to a joke the two had shared. She testified:

Q: In your position, did you have the opportunity to become familiar with the various customers that would come in?

A: Yes.

Q: And did you get to the point where you could recognize many on sight?

A: Yes.

Q: And did you get become familiar with them on an individual basis?

11

A: Yes. I knew them when they came in.

.........

Q: Did you become familiar enough with -- did you become familiar enough with the various customers that you would recognize them by their voice alone?

A: Some of them, yes.

......

Q: ...Did you receive an anonymous telephone call on February 28th, 1992?

A: Yes.

......

Q: Ms. Hallock, did you recognize the voice on the telephone?

A: At first I did not. He called twice. When he called back again, because Barry [Panitz] was not there, the voice was familiar but I couldn't put a place, or couldn't put a picture in my brain as to who it was. And during the conversation he said, remember you told the driver that he would get caught by the DOT for an overload, and then I knew who it was. The voice and the face just came together. It was Larry Wade.

......

Q: And then what did he say when you told him that Barry, Mr. Panitz, was not there?

A: He told me that the company was being ripped off, that's his words, by someone we would not ever dream of him doing it. And I said well, who do you think it is? He said, I can't tell you the name but it's a black headed boy on the scales -- black headed man on the scales.

Q: And with that description of a black headed man on the scales, were you able to identify which employee that was?

A: Yes. It was only one black headed person on the scales. It was Mark Hiller.

During trial, Larry Wade, himself, referred to the occasion when he and Mary Hallock had joked

about the heavy loads he supposedly was bringing into Southern Tin. He stated:

Q: Were you ever questioned about anything when you would go to pick up the check?

A: No. Ms. Mary asked me, said, made a remark once about the trailer being loaded heavy.

Q: Did you reply anything?

A: I just, you know, I laughed at her. I didn't know how to take her about it. I didn't know, really know what she was talking about. I mean, she was smiling and, you know, cutting up. So I just kind of shrugged it off, you know, smiled back at her and that was the end of it.

Mark Curland, Hiller's cousin, was Southern Tin's non-ferrous metals manager during

the relevant time period and, in that capacity, he was on site nearly every working day. At trial, Curland testified that he would have noticed if Goodner or his agents had been hauling large quantities on metal into the scrap yard. Specifically, Curland stated:

> Q: You're saying you're down at the scrap yard day to day. Did you see, like tractor trailers or large dump trucks coming in with scrap on a daily basis?
>
> A: I didn't see anything unusual as far as great big amounts because something like that would have been noticeable. I mean, it's not, let me say, it's not unusual to see a large truck come in, but you would notice it. I mean, it would be something that you would see.
>
> Q: You're saying a great big amount. What would that be?
>
> A: Well, if you see a seventy foot truck come in, I mean in order to haul forty thousand pounds of grade, it would have to be a truck longer than this room. I mean, there's no way you could possibly haul it on anything smaller.
>
> Q: Did you see Bob Goodner bring in trucks in like that?
>
> A: I never saw that Mr. -- I never saw anyone at all, that I can recall, ever bringing in any trucks or even coming in.
>
> Q: Do you know of a Mr. Larry Wade ever bringing in trucks that size?
>
> A: No, sir. I never saw him.
>
> Q: Do you know of anybody working for Mr. Goodner who would bring in loads that large?
> ......
> A: No, sir.
>
> Q: Would you have noticed any one entity or individual bringing in those amounts of steel?
>
> A: Yes, sir. As many times as this was reported, this supposedly coming in, yes, sir, after a period of time it would have been quite noticeable. One reason, our inventory would have just jumped way up. It would have been something I would have seen. You couldn't help but notice.

On March 3, 1992, Southern Tin filed a verified complaint for money damages and for an injunction against the defendants in the Shelby County Chancery Court. Following discovery, the case was tried without a jury.

The Chancellor entered an order of judgment on February 14, 1997, that awarded Southern Tin a judgment against the Defendants, jointly and severally, for compensatory damages in the amount of $490,000 and for punitive damages in the amount of $200,000. Appellants Hiller and

Goodner have appealed and the only issue for review is whether the evidence preponderates against the findings of the trial court.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13 (d). ***Varley v. Varley***, 934 S.W.2d 659, 667 (Tenn. App. 1996); ***Beacon Hill Property Owners Assoc., Inc. v. Palmer Properties, Inc.***, 911 S.W.2d 736, 737 (Tenn. App. 1995). Review of questions of law is likewise *de novo* but with no presumption of correctness. ***City of Tullahoma v. Bedford County***, 938 S.W.2d 408, 412 (Tenn. 1997).

Central to this case is a finding that Southern Tin did not receive the scrap metal in return for the checks it issued to Goodner. Witness credibility is a determinative factor in cases such as this. After hearing all the proof, the Chancellor concluded that Southern Tin's witnesses were credible and that Hiller and Goodner lacked credibility.

> In this Court's opinion the key is did the scrap come in. In evaluating that the Court has had the opportunity to hear the testimony of Mr. Curland. Mr. Curland in this Court's opinion is an honest man. He is a truthful witness. He has got nothing to gain or lose the Court believes by his telling the truth. He seemed very uneasy and so stated about having to testify against a cousin [Mark Hiller] whom he expresses a great deal of affection for. It did not seem insincere to this Court at all.
>
> Now, Mr. Curland's job was very different than that of Mrs. Hallock's job. Mrs. Hallock in this Court's opinion was an exceptionally honest person as well. And she seemed very clear about what she had to say, and in this Court's opinion was very truthful. And both of these witnesses when they were uncertain about things, came across to the Court as not trying to embellish or diminish their lack of certainty. Now Mrs. Hallock's job was very simple. The people who are doing the weighing the tickets are turned over to her and she cuts out the checks and she pays the people. Mr. Curland is not involved in that. He wouldn't know about all of that. The one thing Mr. Curland does know that if this volume of material were coming in during this period, he said quote, it would have stuck out like a sore thumb, closed quotes to him. This Court believes that. He said that if a truck was large -- a large truck anything bigger than one ton than [sic] he would have been called over, but not on small peddlers, and he would have noticed these large transactions. In fact on his own if he had seen big eighteen wheeler trucks and didn't know whose they were, he would have questioned it. That was part of his duty. It is his job was one that had accomplished these responsibilities in his mind. And as he said after a short time, this volume and number of trips would have come to his attention. Mr. Curland in this Court's opinion is credible as I have said.

> Now the question is, is he believed over the defendants who say it was all brought in. This Court does not find, and much to its regret, for the Court always hates to reach a conclusion such as the following, but *the Court does not find that Mr. Hiller and Mr. Goodner are credible witnesses. It does not find that they have been truthful on this issue or many others*.
>
> The Court finds that it is easily reconciled why Mr. Curland would not have known of this absence because Mr. Curland didn't know of this effort by these defendants until after the investigation begins. But after it begins, and after all of this is brought to his attention about this is what this record shows that they supposedly brought in, his testimony is very clear. It didn't happen. This Court finds that to be credible.
> (Emphasis added).

The trial judge as the trier of fact had the opportunity to observe the manner and demeanor of all the witnesses as they testified from the witness stand. The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Haverlah v. Memphis Aviation, Inc.*, 674 S.W.2d 297, 302 (Tenn. App. 1984). The credibility determination of the trial court is binding on the appellate court unless, from other real evidence, the appellate court is compelled to conclude to the contrary. *State ex rel. Balsinger v. Town of Madisonville*, 222 Tenn. 272, 435 S.W.2d 803 (1968); *Hudson v. Capps*, 651 S.W.2d 243 (Tenn. App. 1983). From the record before us, we find that the evidence does not preponderate against the chancellor's findings that defendants defrauded the plaintiff.

Hiller and Goodner also assert that Southern Tin failed to prove its damages with a reasonable degree of certainty. In calculating damages, Southern Tin's manager, Barry Panitz, testified that during the relevant time period Southern Tin issued checks to Goodner for $500,136.15. Southern Tin recognized and admitted that Goodner may have brought in some scrap, including a small amount of aluminum and a load of batteries. In fact, Larry Wade, Goodner's bag man, testified that he brought in, on occasion, some small amount of aluminum. Therefore, Southern Tin deducted those amounts that might have been paid for legitimate transactions from the total paid to Goodner over the 28 months of the fraud.

To refute Southern Tin's calculations, the defendants introduced the testimony of Don Carpenter, a certified public accountant with a specialty in fraud investigation. On direct examination, Carpenter testified that based on his study of the records furnished to him he saw no indication that Hiller and Goodner committed the theft of $500,000.00. He further stated that

to prove the loss a physical inventory was necessary and a time-lapse between the inventories would give more opportunity for discrepancies. Carpenter opined that the plaintiff's method of calculating its loss was not a legitimate method. However, on cross-examination, Carpenter testified that if one accepts Southern Tin's proof of non-delivery of the scrap metal, then Southern Tin's calculation of damages is legitimate. Specifically, Carpenter testified as follows:

> Q: ...Assume there was a legitimate transaction by Mr. Goodner.
>
> A: The first five or six, okay.
>
> Q: Could we not deduct the first five and deduct the aluminum and get the total of the rest? Yes or no, please.
> ......
> A: Yes, I mean -- yes, if you decided all the rest were legitimate and these six were legitimate and you subtracted those from the gross total but yes -- assuming all of the others are illegitimate.
>
> Q: I have got more to this. Assume Mr. Pantiz [sic] said that the rest of the transactions are impossible to have occurred and Mr. Curland said that the transactions were impossible to have occurred because they are there everyday and they know they didn't occur. Then you can take out the aluminum and you can take out the first five, and then if you accept Mr. Panitz's testimony and Mr. Curland's testimony, and if you accept it, then you know the rest were not legitimate transactions, wouldn't you?
>
> A: I would say if you accepted that testimony on its face, that would be true.

In determining the amount of damages, the trial court generously gave Hiller and Goodner a credit in excess of $10,000 for legitimate sales to Southern Tin during the relevant time period. That amount was deducted from the $500,136.15 in actual damages proved, and the trial court entered a judgment in favor of Southern Tin for $490,000.00. Contrary to the appellants' assertions, mathematical certainty is not required to support an award where there is substantial evidence in the record from which reasonable inferences may be drawn regarding the amount of damages. *Cummins v. Brodie*, 667 S.W.2d 759, 765 (Tenn. App. 1983). From the record before us, we conclude that there is ample evidence to support the chancellor's determination of $490,000.00 in compensatory damages and $200,000.00 in punitive damages.

The judgment of the trial court is affirmed, and this case is remanded to the trial court for such further proceedings as may be necessary. Costs of the appeal are assessed

16

against the appellants.

_____
**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

_____
**ALAN E. HIGHERS, JUDGE**

_____
**HOLLY KIRBY LILLARD, JUDGE**