IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 19, 2002 Session

# GEORGE HAMILTON, V v. THE STARDUST THEATRE, INC., ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 00-965-II     Carol McCoy, Chancellor**

_____

**No. M2001-00678-COA-R3-CV - Filed June 11, 2002**

_____

A singer/songwriter brought a copyright infringement suit against a country music theater, its manager and its owner. The defendants admitted to the unlicenced use of the plaintiff's trademark, but argued that the plaintiff did not suffer any damages from their infringement. The trial court did not agree, and awarded the plaintiff over $90,000. We reverse in part, because we believe that the evidence preponderates against the court's award of damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part; Reversed in Part; and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., J. and BUDDY D. PERRY, SP. J., joined.

Grant Smith, Goodlettsville, Tennessee, for the appellants, The Stardust Theatre, Inc., Gary Bridges, and Edward H. Arnold.

Melissa M. Allen, Nashville, Tennessee, for the appellee, George Hamilton, V.

**OPINION**

### I. THE CREATION AND INFRINGEMENT OF A TRADEMARK

In 1993, country music singer/songwriter George Hamilton, V came up with the expression "Viva NashVegas," and began using it as a signature part of his act, shouting it from the stage at each live performance. He wrote and recorded a theme song with that title, and renamed his band the NashVegas Nomads. He also used the expression in the name of his record label and his music publishing company.

On August 14, 1995, Mr. Hamilton registered Viva NashVegas as a trademark in the office of the Tennessee Secretary of State. Over the years, several organizations used the expression Viva NashVegas without Mr. Hamilton's permission, but he was able to get them to stop the infringement

by writing a cease and desist letter. On two occasions, he licensed the trademark without charge for fundraising events conducted by Nashville charities. In 1995, Mr. Hamilton began producing bumper stickers with the Viva NashVegas imprint. In 1999, he added baseball caps, coffee mugs, T-shirts, shot glasses and souvenir license plates. In the same year, he applied for registration of his trademark and service mark with the United States Patent and Trademark office.

On May 12, 1999, an acquaintance of Mr. Hamilton showed him a full-color advertisement in *Travel Host Magazine* for a musical production named Viva NashVegas, which was being performed at The Stardust Theater on Music Valley Drive. According to the advertisement, the production featured musicians doing impersonations of famous country artists like Hank Williams, Shania Twain, and Garth Brooks, while performing their songs. This show was very different from Mr. Hamilton's own performances, which featured his efforts to produce alternate country music, or musical works outside the mainstream of country music.

Mr Hamilton contacted Gary Bridges, the manager of The Stardust Theater. According to Mr. Hamilton, Mr. Bridges verbally agreed to license the name from him for $2,400, and to send Mr. Hamilton letters and contracts so the parties could formalize an agreement, but these were never received. The Stardust Theatre subsequently added a Viva NashVegas gift shop to its facilities, and began selling its own versions of Viva NashVegas baseball caps, coffee mugs and T-shirts.

When Mr. Hamilton realized that no licensing agreement would be forthcoming, he sent a letter to the theater notifying it to cease and desist all use of the trademark. This did not have the desired effect because advertisements for the production continued to appear in numerous tourist publications. Mr. Hamilton sent at least four other cease and desist letters, including one to defendant Edward Arnold, but they apparently had no more effect than the first one.

## II. PROCEEDINGS IN THE TRIAL COURT

On March 28, 2000, Mr. Hamilton filed a complaint for trademark infringement, naming as defendants The Stardust Theater, Gary Bridges, and Stardust Theater owner Edward Arnold, a wealthy Pennsylvania businessman. The defendants did not respond, and on June 14, 2000, the plaintiff filed a Motion for Default Judgment. The trial court granted the default judgment on August 7, 2000, finding that Mr. Hamilton was the exclusive owner of the trademark, and that the defendants were infringers. The defendants were enjoined from using the trademark, and were ordered to surrender all infringing products, to account to the plaintiff for any profits they received, and to pay him for any damages he suffered.

The next proceeding in this case was a hearing on damages, conducted on January 17, 2001, during which the defendant theater and Mr. Arnold were represented by counsel. The defendants admitted to the trademark infringement, but argued that Mr. Hamilton was not entitled to any recovery. They claimed that The Stardust Theater had never earned any profits, that the Viva NashVegas trademark had little or no commercial value, and that Mr. Hamilton had not suffered any monetary damages as a result of their activities.

Seven witnesses testified for the plaintiff (including Mr. Hamilton himself), and one for the defendants. Mr. Hamilton testified that after he learned of the copyright infringement, he spent a great deal of time and energy attempting to get the defendants to stop using his trademark. He claimed that this created a huge distraction, which made his productivity as a performer and songwriter decline. He noted that a $24,000 a year songwriting contract that he had maintained with Mike Curb Music for five years was not renewed, and that his income declined from $70,000 in 1998 to $30,000 in 1999. The defendants' attorney suggested that there was no connection between the reduction in Mr. Hamilton's income and his clients' use of the Viva NashVegas trademark, and disparaged Mr. Hamilton's career, in order to minimize any possible claim for damage to that career.

Defense witness Gordon Dillingham had been the stage manager of The Stardust Theater, and he became the general manager in September of 2000, after Mr. Bridges was fired for theft and embezzlement. Mr. Dillingham testified that Mr. Bridges had shredded or destroyed all the books and records of the enterprise, but that to the best of his knowledge, The Stardust Theater had never earned a profit, and only managed to remain in operation because of regular infusions of cash from defendant Arnold. Mr. Dillingham also testified that after becoming general manager, he made an effort to cancel some of the advertising bearing Mr. Hamilton's trademark, but that despite these efforts, some advertising continued to run through the end of 2000.

At the conclusion of the hearing, the trial judge issued a ruling from the bench, which was memorialized in a judgment filed on January 30, 2001. The findings of fact that were made part of the judgment included determinations that the defendants had knowingly infringed upon the Viva NashVegas trademark, that they had earned no profits from the infringement, but that the plaintiff had suffered actual damages as a result of their actions, which amounted to $76,600.

The damages awarded included $20,000 for the loss in productivity and income that Mr. Hamilton suffered after learning of the infringement. Another $56,600 represented daily damages to the plaintiff at the rate of $100 per day for the continuing infringement of the trademark between the defendants' first notice of it on May 2, 1999 until December 31, 2000. The trial court also awarded the plaintiff attorney fees in the amount of $14,055, and court costs in the amount of $406.50, for a total judgment of over $91,000. This appeal followed.

### III. THE QUESTION OF DAMAGES

The version of the Tennessee Model Trademark Act in effect at the time the complaint in this case was filed set out the damages recoverable for trademark infringement at Tenn. Code. Ann. § 47-25-513(a). That statute read in pertinent part,

> Any owner of a mark registered under this part may proceed by suit to enjoin the manufacture, use, display, or sale of any reproductions, counterfeits, copies or imitations thereof, and any court of competent jurisdiction may grant injunctions to restrain such manufacture, use, display, or sale as may be by the court deemed just and reasonable, and may require the defendants to pay such owner all profits derived

from and/or all damages suffered by reason of such wrongful manufacture, use, display or sale.[1]

The trial court found that The Stardust Theater did not earn any profits from its operations. The questions on appeal pertain only to whether Mr. Hamilton was damaged by its infringement on his trademark, and if so, to what degree. To deal with these questions, we must examine the three main components of the trial court's award separately. We note that our review of the trial court's findings of fact are de novo upon the record, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Rule 13(d), Tenn. R. App. P.

## A. LOSS OF PRODUCTIVITY AND INCOME

The trial court found that Mr. Hamilton's annual income declined in 1999 from $70,000 to $30,000, and that half of the decline was directly caused by the infringement and violation of his trademark. The appellants contend that the trial court abused its discretion in awarding the plaintiff any compensatory damages at all for loss of income. They argue that the proof that Mr. Hamilton's income declined is very thin and is based solely on his own testimony. They further claim that any decline was simply a reflection of Mr. Hamilton's own failure to produce a hit record or to make a big enough name for himself in the world of country music, rather than the result of any actions on their part.

It appears to us, however, that the evidence does not preponderate against the trial court's finding as to Mr. Hamilton's income. And while the appellants proved their point that Mr. Hamilton had not become a major celebrity in his chosen profession, the evidence clearly shows that he has supported himself for many years as a performer and songwriter, that he produced records, that he and his band toured Europe many times, as well as South America, Australia and New Zealand, and that he has an international fan base.

There is also ample evidence in the record that the distraction and emotional distress caused by the defendants' use of Mr. Hamilton's trademark, and their refusal to acknowledge his legal rights, contributed significantly to the reduction in his income. As he stated, during this entire period "I was writing letters instead of songs." His testimony that he became so preoccupied with the

---

[1]The Tennessee Trademark Act was amended after the complaint in this action was filed [Acts 2000, ch. 671 § 1] with the express purpose of creating a system substantially consistent with the federal trademark statutes. The new statute on damages (renumbered as Tenn. Code Ann. § 47-25-514) gives the courts discretion to grant an award of up to three times the amount of proven damages, as well as attorney fees. The earlier version had no such provisions. The plaintiff has suggested that damages could be awarded in this case in accordance with the amended statute. However, retroactive application of a statute that increases the amount recoverable by a plaintiff is generally forbidden on the ground that it would disturb the vested rights enjoyed under former law by the defendants. *See Slutsky v. City of Chattanooga*, 34 S.W.3d 467 (Tenn. Ct. App. 2000); *Nutt v. Champion International Corp*, 980 S.W.2d 365 (Tenn. 1998); *Anderson v. Memphis Housing Authority*, 534 S.W.2d 125 (Tenn. Ct. App.1975).

question of vindicating his rights that it almost entirely displaced his creative activities was corroborated by several other witnesses, including Mary Stewart-Devoursney, a former Vice-President of Curb Records and Publishing; Tom Comer, Mr. Hamilton's collaborator, engineer and sometime sideman; and country musician George Hamilton IV, the plaintiff's father.

The plaintiff spent a great deal of time and energy searching out and collecting advertisements for The Stardust Theater's Viva NashVegas production, in order to determine the extent of the defendants' infringement. The record contains numerous magazines, brochures and other publications which he collected, all containing such advertisements. These include copies (and in many cases multiple issues) of *Nashville Travelhost*, *Nashville Music Guide*, *Nashville Street Map and Visitor Guide*, *Key Magazine*, *In and Around Nashville Tour Guide*, *Western Beat Monthly*, *Music City Vacation Guide*, Grayline Sightseeing brochures, Grand Ole Opry programs, *Best Read Guide*, Nashville Area *Wonderbook*, *The Tennessean*, *Nashville Scene* and the *Bell South Real Yellow Pages*, as well as fliers that were distributed at airports, hotels, and hospitality centers.

Aside from the time he spent hunting down these advertisements, Mr. Hamilton testified that their sheer volume led him to cut back on his live performances because he did not have equivalent resources to advertise effectively, or without creating confusion between his act and the defendants' productions. The possibility of such confusion also led the plaintiff to decline to perform with his father on the Grand Ole Opry after he became aware that Stardust Theater was advertising in the Opry program. He further testified that the Ernest Tubb Record Shop wouldn't display his Viva NashVegas merchandise because that would give the appearance of advertising a competing venue.

Tina Helms, who is employed by the publisher of the Nashville Area *Wonderbook*, testified that an advertisement such as the one purchased by The Stardust Theater would cost $11,112 annually. Julie Hacker, who sells advertisements for the *Nashville Street Map and Visitors Guide* testified that The Stardust Theater's advertisement in that publication cost $6,000 per year. Mr. Hamilton estimated (over the defendants' objection that he was not qualified to give an opinion because he never purchased advertising in such volume) that it would cost him about $165,000 per year to place equivalent advertisements. It is something of a mystery as to why the defendants declined to pay a modest licensing fee to Mr. Hamilton for the use of his trademarked expression, when they did not hesitate to spend over $100,000 to advertise a show that used that expression as its title.

Under questioning during oral argument in this appeal, the appellants' attorney conceded that "theoretically at least, he could have been damaged," and later stated that "yes, he was damaged, but it is very shaky that he was damaged to the extent of $20,000." However, once the fact of damages is proven in a tort case, the plaintiff is entitled to a reasonable recovery, even if the amount of the damages is uncertain, or cannot be determined with mathematical certainty. *See Walker v. Sidney Gilreath & Associates*, 40 S.W.3d 66 (Tenn. Ct. App. 2000); *Keith v. Murfreesboro Livestock Market, Inc*. 780 S.W.2d 751 (Tenn. Ct. App. 1989); *Cummins v. Brodie*, 667 S.W.2d 759 (Tenn. Ct. App. 1983).

The appellee refers us to language found in the case of *Broan Mfg. v. Associated Distributors, Inc.*, 923 F.2d 1232 (6th Cir. 1991) which seems particularly applicable to the case at hand. "The plaintiff is held to a lower burden of proof in ascertaining the exact amount of damages, because the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." 923 F.2d at 1236 (quoting from *Bigelow v. RKO Radio Pictures, Inc.* 327 U.S. 251 (1946)). *Broan* was a trademark infringement case involving counterfeit bathroom fans. Interestingly, the court found that future lost profits and future mistaken product liability claims were a legitimate element of damages, even though such damages by their nature could not be calculated with any certainty.

In the present case, the proof shows that Mr. Hamilton's income declined $40,000 in the year in which he discovered that his trademark was being misused by the defendants, and that the defendants' actions caused some of this decline. The trial court found that half of this loss, or $20,000, could be attributed to the defendants' actions. We do not believe the evidence preponderates against the trial court's finding, and we affirm this portion of its damage award.

### B. DAILY DAMAGES

The trial court described the second component of the damages it awarded as follows:

"Fifty-Six Thousand Six Hundred Dollars ($56,600) representing a daily damage to Plaintiff for Defendants' on-going, continuous and direct infringement of the mark, and failure to comply with this court's orders and injunction, in the amount of One Hundred Dollars ($100.00) a day for Five Hundred and Sixty-Six (566) days, from the date Defendants first received notice from Plaintiff on May 2, 1999 to December 31, 2000.

We are somewhat baffled as to how this award was meant to fit in with the previously discussed damages. For one thing, the substantial overlap of dates between the period for which these damages were awarded and the period during which the plaintiff's income declined, leads to the inescapable conclusion that at least part of this award is duplicative. There is also no evidence in the record to support the theory that Mr. Hamilton's damages accrued at the rate of $100 per day, and also no indication in the trial court's judgment as to how it arrived at that figure.

Appellants point out that there are very few cases dealing specifically with damages under the Tennessee trademark laws, and they urge us to look to federal trademark law for guidance. Section 35 of the Lanham Act, 15 U.S.C. § 1117 (1996), allows the courts to award the plaintiff up to three times his actual damages if justice requires, but also states that such sum "shall constitute compensation and not a penalty." While we are not bound by the Lanham Act, we note that the only penalties mentioned in the former Tennessee Model Trademark Act are criminal penalties. *See* Tenn. Code. Ann. § 47-25-513(b). We thus cannot find a basis for the daily damages awarded by the trial court. While we agree that the defendants' violation of the trial court's injunction may have

warranted sanctions against them, such sanctions could have been more appropriately pursued in an action for contempt. *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987).

### C. ATTORNEY FEES

Unlike either the amended version of the Tennessee Trademark Act or the federal act, the former Tenn. Code. Ann. § 47-25-513 made no provision for awarding attorney fees to the prevailing party. We thus believe that the trial court exceeded the authority granted it under the former statute, and we reverse the award of attorney fees. This does not affect its assessment against the defendants for court costs in the amount of $406.50, or for its later award of discretionary costs in the amount of $208. *See* Rule 54.04, Tenn. R. Civ. P.

### IV.

The trial court's $20,000 award to the plaintiff for the reduction in his income is affirmed. Its $56,600 award of daily damages is reversed, as is its award of attorney fees. Remand this cause to the Chancery Court of Davidson County for further proceedings consistent with this opinion. Divide the costs on appeal equally between the appellants and the appellee.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.