IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 22, 2019 Session

## B.W. BYRD METAL FABRICATORS, INC. v. ALCOA, INC.

Appeal from the Circuit Court for Knox County
No. 2-92-16   William T. Ailor, Judge

_____

### No. E2018-01750-COA-R3-CV

_____

This appeal involves a lease agreement for the storage of a friction welding/joiner machine.   The original agreement was entered into by John F. Humphrey Metal Fabricators, Inc. and Aluminum Company of America.  B. W. Byrd Metal Fabricators, Inc. is the successor in interest to John F. Humphrey Metal Fabricators, Inc. and Aluminum Company of America was formerly known as Alcoa, Inc.[1]  The trial court awarded to the plaintiff rent payments for the months of May and June 2012, plus interest at 1.5% per month, but it found that the plaintiff had failed to submit invoices to put the defendant on notice of a debt and neglected to mitigate its damages.  The plaintiff appeals.  We affirm in part and reverse in part and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed in Part and Reversed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ARNOLD B. GOLDIN, J., joined.

Raymond E. Lacy and Michael R. Franz, Knoxville, Tennessee, for the appellant, B.W. Byrd Metal Fabricators, Inc.

Michael K. Atkins, Knoxville, Tennessee, for the appellee, Alcoa, Inc.

_____

[1] For the purposes of this lawsuit, Alcoa, Inc. and Arconic, Inc. are the same entity.  The parties stipulated that any judgment entered against Alcoa, Inc. shall be deemed a judgment against Arconic, Inc. as well.

# OPINION

## I. BACKGROUND

In 1969, John F. Humphrey Metal Fabricators, Inc. ("Humphrey"), a Tennessee corporation, entered into a contract ("the Original Agreement") with Aluminum Company of America (whose name was changed to Alcoa, Inc. and herein referred to as "Alcoa"), a Pennsylvania corporation whose corporate center is located in Pittsburgh. The Original Agreement was to lease a building for the purpose of housing a friction welding/joiner machine ("the Machine")[2] that welded aluminum to steel. The Machine was promptly delivered to Humphrey's site at 4422 Anderson Road in Knoxville pursuant to the Original Agreement. According to testimony, one piece of the Machine alone weighs as much as 65,000 pounds. The Machine sits on a four-foot concrete base and a metal building was custom built to house and protect it from the elements. Through the years, Humphrey maintained and cared for the Machine, used it to produce anode rods, and performed other work for Alcoa. Alcoa, in turn, paid rent to Humphrey for the storage of the Machine. B. W. Byrd Metal Fabricators, Inc. ("Byrd"), through its President Billy W. Byrd ("Owner"), subsequently acquired the business of Humphrey as well as possession of the Machine and assumed all of the rights and obligations under the Original Agreement as successor in interest to Humphrey. Owner remarked at trial that Alcoa was "[a] very good customer" and agreed that the company was "[t]he best there is." He acknowledged that Alcoa had hired his company to perform work for many years and that he "did several million dollars' worth of jobs for Alcoa."

Beginning in approximately August 2010, Owner and Dave Hensley, Alcoa's former interim plant manager at the Tennessee Operations South Plant, negotiated a modification of the monthly amount of rent owed by Alcoa to Byrd to $1,750 (this agreement hereinafter referred to as "the Lease Agreement").[3] For each payment of rent, Byrd sent Alcoa an invoice with the purchase order number of 260216863 reflecting the Lease Agreement. Payments were made to Byrd from Pittsburgh. It was stipulated before the trial court that $1,750 was paid to Byrd from August 2010 to April 2012. By September 2011, however, Alcoa had determined that it had no further use for the

---

[2] Purchase Order No. PF-11768-X-AMF Flywheel Friction Welder, special Model 140A and attachments and accessories.

[3] Paragraph 3 of the Original Agreement states that the Lessee [Byrd] would owe rent to Lessor [Alcoa] in the amount of $1.00. Paragraph 17 contains a provision that prohibited modification of the agreement unless that modification was done by an instrument in writing, signed by both parties. There was no proof in the record to indicate whether this modification was in writing or orally. The trial court, however, found that the Lease Agreement provided Alcoa would pay rent to Byrd in the amount of $1,750 per month. Whether the Lease Agreement was a modification of the Original Agreement or a second contractual agreement was not an issue developed in the trial court; thus, it is not a subject for our review. Indeed, the existence of the contractual obligation to pay rent is not disputed by the parties.

Machine and paid Byrd $18,500 to "mothball" it in a process that would render it in an inactive state where it could easily and quickly be reverted to use if necessary. During this time, Alcoa's South Plant had been idled, and the company was ridding itself of all unneeded equipment. The Machine, which utilized outdated technology, was determined to be obsolete. Alcoa decided to sell it for scrap. According to Byrd, however, Alcoa did not inform it at that time that the Machine was to be removed from its premises.

According to Alcoa, from September to November 2011, its officials attempted to gain access to the Machine but were unable to reach Owner. When Owner was finally located in early November 2011, he informed Tim Cromwell of GoIndustry DoveBid, Alcoa's agent for the sale of the Machine, that "he has not received a rent check in 2 months and was not too keen on the idea of anyone coming to look at (or removing) the equipment until he gets paid." The record reveals that the Lease Agreement had expired in August 2011, and Alcoa understood "that the mothball order concluded [its] commitment with Byrd until [it] could have the equipment removed." Thus, in Alcoa's view, it did not owe Byrd any additional money. An Alcoa official related in an email: "We certainly need not continue to pay Byrd . . . they have received excessive compensation from Alcoa over the years with this situation and the anode contract they have enjoyed over the years at TN. . . . In my opinion it is robbery to think that we are still paying them rent!" A potential buyer for the Machine informed Alcoa officials in late November 2011 that Owner "told him that Alcoa owes him money and until it is settled, he will not let anyone remove the machine."

On January 13, 2012, Byrd received a letter from Carol Sue (Suzie) Reed at Alcoa informing him that the company was in the process of selling the Machine and that rent would only be paid through December 2011. The letter specifically provided:

> **Enclosed you will find Alcoa Purchase Order number 260282996**. This order will enable rent payment for the building where Alcoa's Equipment is currently located for **September 2011 through December 2011**. **No additional money will be paid as Alcoa has been working to sell the equipment for several months.** We request that you cooperate and give full access to Alcoa's Friction Joinder and associated equipment to our Agent, Go Industries in their efforts to sell our equipment as the Tennessee Smelter is now permanently closed. Upon notice from our Agent that you have complied with Alcoa's request, your invoice payment for the Purchase Order referenced above will be released.

(Emphasis added.). Reed testified at trial that her boss, Randy Gibson, instructed her to write the letter and that it was her intention "to put Mr. Byrd on notice that Alcoa was finished with that piece of equipment and . . . was trying to sell it." The new purchase order number noted by Reed, 260282996, allowed Byrd to receive an additional rent payment for the period after the Lease Agreement had ended. Another Alcoa employee,

Craig Brogan, testified that the plant manager, Hensley, instructed that rent payments be made as long as the Machine remained on Byrd's property; Hensley acknowledged this position at trial. The parties stipulated that Alcoa paid Byrd $7,000 in January 2012 for the months September through December 2011. Despite the fact that Alcoa had indicated in the letter that "[n]o additional money will be paid," on June 5, 2012, it appears that Alcoa paid Byrd another $7,000 in rent.[4]

As noted above, Owner had been advised by Alcoa that it was attempting to sell the Machine and asked to "cooperate and give full access" to the Machine by the agents or potential buyers. However, in a February 2012 email, Cromwell advised Reed at Alcoa of "extreme" demands by Owner related to the removal of the Machine.

On June 18, 2012, Alcoa, through Cromwell, sold the Machine to R&M Metals, Inc. ("R&M"). R&M planned to remove the Machine, at its own cost, and sell it for scrap. The agreement between Alcoa and R&M, however, did not address the issue of rent because Alcoa believed that it owed nothing further.[5] Owner advised a representative of R&M of the existence of the past due rent and noted that satisfaction of the debt was a condition of the Machine's removal. According to Owner's testimony, he told R&M's representative that "all . . . he had to do was see that the rent got paid and he could do whatever he wanted to with [the Machine]." Cromwell advised Alcoa's Reed and Randy Bush on June 25, 2012, that Owner "still insists that Alcoa still owes him money and will not let us in." Owner testified that he never heard from R&M again, and the Machine was subsequently sold to JBM Incorporated ("JBM"). Like R&M, JBM never removed the Machine. At the time of this appeal, the Machine was still located on Byrd's property.

In February 2016, Byrd sued Alcoa, alleging breach of contract by failing to remove the Machine from Byrd's property and neglecting to pay rent. A month later, Byrd filed for bankruptcy.[6] He asserted that potential buyers for the property have "backed out on account of that machine." Owner admitted that he had to shut the company down because he had depended on the $1,750 a month rent from Alcoa to pay the bills.

The trial court found that Byrd had breached its duty to mitigate its damages by not submitting invoices to Alcoa and by not allowing any party to remove the Machine. The court determined that no rent invoices were sent to Alcoa for May and June 2012, or anytime thereafter.[7] Additionally, the trial court observed that despite Byrd knowing that

---

[4] According to Brogan, the purchase order number referenced on the payment was the one he authorized for the months of September through December 2011.

[5] Byrd asserts that Alcoa owed $3,500 for two months' rent.

[6] The bankruptcy was discharged on December 22, 2017.

[7] Byrd asserts that it sent invoices to Alcoa covering the rental payments owed through at

Alcoa no longer owned the Machine after June 2012, he waited until February 2016, to file the lawsuit that is the subject of this appeal and failed to put Alcoa on notice of the rent obligation during that period. Therefore, the court's award was limited to rent payments for May and June 2012 in the amount of $3,500 plus interest at 1.5% per month ($3,908.50) for a total judgment in favor of Byrd of $7,408.50. Byrd filed this timely appeal.

## II. ISSUES

Byrd raises two issues for review which we restate as follows:

A. Whether the trial court erred in its factual finding that Byrd did not invoice Alcoa for rent after April 2012; and

B. Whether the trial court erred in its finding that Byrd failed to satisfy its duty to mitigate its damages.

Alcoa presents an additional alternative issue for review which we restate as follows:

C. Whether Byrd is barred from prevailing under the common law doctrine of laches.

## III. STANDARD OF REVIEW

This appeal follows a bench trial, and as such we review the trial court's findings of fact *de novo* with a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). We will also give great weight to a trial court's factual findings that rest on determinations of credibility. *In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). However, if the trial judge has not made a specific finding of fact on a particular matter, we review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). For the evidence to preponderate against a trial court's finding of fact, evidence must support another finding of fact with greater convincing effect. *Id.*; s*ee also Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). Issues of law, on the other hand, are reviewed *de novo* with no presumption of correctness, and we reach our own independent

least July 2012.

conclusions regarding these issues. *Id*.; *see also Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 425 (Tenn. Ct. App. 2005).

## IV. DISCUSSION

### A.

The Original Agreement contained a choice of law provision designating the law of Pennsylvania as governing the agreement. Despite our uncertainty whether the Lease Agreement at issue before us is a true modification or extension of the Original Agreement, the existence of the latter agreement is not in dispute between the parties, and the laws of both Tennessee and Pennsylvania are similar regarding the doctrine of mitigation of damages. Therefore, whether the Lease Agreement is a modification of the Original Agreement governed by the law of Pennsylvania or an entirely different contractual agreement governed by the law of Tennessee was not developed in the trial court and is not an issue for our review. We simply note that the same result would occur under either state's law.

We turn first to Byrd's contention that it did submit invoices after April 2012, and, even if it failed to submit them, that would not preclude it from recovering rent payments.

We have summarized the standard by which a factual finding may be reversed:

Tenn. R. App. P. 13(d)'s presumption of correctness requires appellate courts to defer to a trial court's findings of fact. *Fell v. Rambo*, 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000); *Taylor v. Trans Aero Corp.*, 924 S.W.2d 109, 112 (Tenn. Ct. App. 1995). Because of the presumption, an appellate court is bound to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true. *Estate of Haynes v. Braden*, 835 S.W.2d 19, 20 (Tenn. Ct. App. 1992) (holding that an appellate court is bound to respect a trial court's findings if it cannot determine that the evidence preponderates otherwise). Thus, for the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect.

*Rawlings*, 78 S.W.3d at 296. Therefore, we review the record, as a whole, to determine whether there is enough evidence contained within to overturn the trial court's findings.

Owner, in his eighties at the time of trial, testified as follows:

Q: There were several payments that were due and some $7,000 was paid by Alcoa to you somewhere around 2012. Do you remember that, that

- 6 -

lump sum payment that paid several months?

A: Yes, sir.

Q: After that time, did your company bill Alcoa for, for payments that were due after that?

A: It's my understanding that we had a bill for two months that they had never paid, so we stopped billing them.

…

Q: Mr. Byrd, I'd like to show you copies of some bills addressed to Alcoa, Inc., attention Susie Reed, and these . . . appear to be copies of invoices from January of 2012 through December of 2012 . . . .

…

Q: Now, Mr., Mr. Byrd, I'm showing you a, a document that appears to be a note –

…

Q: Where did you find this note?

A: … It's, it's a note to me concerning these invoices.

Q: Okay. So this note that you have in front of you was something that you brought from your office as a part of your business records and for you to review; is that correct?

A: Right. That's correct.

…

Q: Can you read that note, Mr. Byrd?

…

A: "I mailed invoices for January through July today. This is one ready for each month and dated them the 15th because that is the way we did last year. The green copies are for your file. I kept a copy also. I hope you're doing well. Thanks, Helen."

…

Q: . . . [A] contract required you to submit purchase orders for jobs and rent to Alcoa on a monthly basis, did they not?

A: Yes.

Q: But you never sent any invoices for rent to Alcoa after – for, for the May and June 2012 payments –

A: Well, they hadn't paid the ones that I had sent them, so there wasn't no use sending anymore.

…

Q: But you will admit that you never submitted any invoices –

A: No.

Q: -- for May and June –

A: No.

Q: -- 2012, correct?

A: They were typed up and ready to go, but they never were mailed.

Q: Okay. So this Exhibit No. 7 from Helen, the note, she never mailed those, did she?

…

A: No.

Although Owner testified that he has had "twelve brain aneurysms, [and has] a little trouble calling things up in a hurry," he noted that "most things [he] can answer." Contrary to Owner's testimony, however, Byrd contends that it submitted invoices and points to a handwritten note authored by Owner's secretary, Helen, dated July 23, 2012. The note, admitted into evidence via a hearsay exception, indicated that invoices were submitted for at least the months of January through July 2012. Byrd argues that the note should be given greater weight than Owner's testimony.

Alcoa asserts that Byrd failed to prove that Alcoa received the invoices and should have called Owner's secretary as a witness. According to Alcoa, Owner never sent invoices after December 2011. The Lease Agreement had expired in August 2011, so the old purchase order number, 260216863, was no longer valid. Plant manager Hensley instructed Brogan to secure additional payment for Byrd, so the new purchase order number, 260282996, was created to obtain rent for September through December 2011.[8] Reed testified that she did not remember receiving any invoices from Byrd after December 2011. She observed: "If, if there was an invoice submitted, it, it would have come across my desk at some point in time and would have been handled." According to Reed, "[t]here were no invoices that were ignored and unpaid unless there was some resolution . . . or agreement that they wouldn't be paid." Alcoa contends that Byrd's argument does not reflect the parties' course of dealing.

Byrd responds that no actual receipt was needed because "proof of due mailing raises a presumption that the letter was received." *U.S. Life Title Ins. Co. of N.Y. v. Dep't of Commerce and Ins. of State of Tenn.*, 770 S.W.2d 537, 542 (Tenn. Ct. App. 1988). However, to prove "that a letter was duly mailed requires evidence that the letter was properly addressed, properly stamped, and duly deposited with the post office." *Id.* Because we cannot say with certainty whether due mailing was established at trial, the presumption that the letter was received does not arise under the facts of this case. We further note that the invoices upon which Byrd relies bear the expired purchase order number connected to the expired Lease Agreement. Based on the record as a whole, we defer to the trial court's findings on the issue of whether Byrd submitted invoices. *See Rawlings*, 78 S.W.3d at 296. We cannot say that Byrd has proved that its version of the facts "supports another finding of fact with greater convincing effort." *Id.*

Next, we analyze whether the trial court erred in its finding that Byrd was required to submit invoices as a condition to receiving rent payments. Byrd argues that the submission of invoices was not a condition for the receipt of rent payments.

Owner admitted on cross examination that the contract required Byrd "to submit purchase orders for jobs and rent to Alcoa on a monthly basis." Multiple current and former employees of Alcoa testified that they were aware of the Lease Agreement and that the submission of invoices to Alcoa to secure payment reflects the course of dealing between the Parties. As the Lease Agreement had expired in August 2011, the "Standard Purchase Order" form that Ms. Reed sent along with her letter to Byrd stated as follows:

---

[8] Brogan opines that the June 5, 2012 payment was actually for September through December 2011. He was not aware of any payment made for any month after December 2011. Despite the testimony, the parties stipulated that Alcoa paid Byrd rent through April 2012. The parties also stipulated at trial that Alcoa owed rent payments to Byrd for the months of May and June 2012.

SEND YOUR INVOICE TO:
ALCOA INC.
2300 NORTH WRIGHT ROAD
ALCOA, TN. 37701-3141
ATTN.: SUZIE REED

The form also detailed that it was "Order/Release # 260282996" and that "po 260216863 at $1750/mo. Expired Aug-11." Additionally noted was that "[t]he above purchase order number must appear on all invoices . . . ." As to the issue of whether Byrd was required to submit invoices, we defer to the trial court's findings. The record, as a whole, supports the trial court's determination.

We now turn to Byrd's next assignment of error: the trial court's finding of Byrd's failure to satisfy the duty to mitigate damages. Because this is a finding of law, we review the trial court's decision *de novo*. Tenn. R. App. P. 13(d). Under both Tennessee and Pennsylvania law, the failure to mitigate damages is an affirmative defense, and the burden of proving a failure to mitigate falls on the defendant, in this case Alcoa. *Allied Waste N. Am., Inc. v. Lewis, King, Krieg & Waldrop, P.C.*, 93 F. Supp. 3d 835, 863-64 (M.D. Tenn. 2015) (quoting *Maness v. Collins*, No. W2008-00941-COA-R3-CV, 2010 WL 4629614, at *11, 2010 Tenn. App. LEXIS 719 (Tenn. Ct. App. Nov. 17, 2010)); *Ecksel v. Orleans Constr. Co.*, 519 A.2d 1021, 1028 (Pa. Super. Ct. 1987). However, "[T]he standard for mitigation of damages is reasonable care; mitigation is not required if it is unduly burdensome or impossible." *Cummins v. Brodie*, 667 S.W.2d 759, 766 (Tenn. Ct. App. 1983) (citing *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228 (Tenn. App. 1976); *Bafile v. Borough of Muncy*, 588 A.2d 462, 464 (Pa. 1991) (stating "a party who suffers a loss due to a breach of contract has a duty to make a reasonable effort to mitigate his losses"). Moreover, under Tennessee law, the "injured party is not required to mitigate damages where such a duty would constitute an undue burden." *Kahn v. Penczner*, No. W2006-02527-COA-R3-CV. 2008 WL 2894827 at *5, 2008 Tenn. App. LEXIS 419 at *14 (Tenn. Ct. App. July 24, 2008) (citing *Cummins*, 667 S.W.2d at 766). Additionally, under Pennsylvania law, the non-breaching party "is not obligated to mitigate damages when both it and the liable party have an equal opportunity to reduce damages." *Truserv Corp. v. Morgan's Tool & Supply Co., Inc.*, 39 A.3d 253, 262 (Pa. 2012) (quoting *Somerset Cmty. Hosp. v. Allan B. Mitchell & Assocs., Inc.*, 685 A.2d 141, 150 (Pa. Super. Ct. 1996)); *Fiat Motors of North America, Inc. v. Mellon Bank, N.A.*, 827 F.2d 924, 930 (3rd Cir. 1987) (under Pennsylvania law, mitigation of damages "is not applicable where the party whose duty it is primarily to perform the contract has equal opportunity for performance").

Alcoa argues that Byrd was in the best position to mitigate its damages. It contends Owner only had to allow R&M to remove the Machine at no cost to Byrd and it would have been off the property. Alcoa further asserts that all Byrd had to do was send invoices for May and June 2012, and it would have paid them. Otherwise, according to

Alcoa, Byrd could have pursued its claim of unpaid rent in a formal court proceeding after the removal of the Machine. Alcoa notes that paragraph 13 of the Original Agreement required Owner, at the request of Alcoa, to remove the Machine (or allow its removal) from his property and deliver it according to Alcoa's instructions.

Asserting a common law storage lien and citing to Tennessee Code Annotated section 47-7-209 to argue a statutory warehouseman's lien, Byrd argues that giving up its lien rights would be unduly burdensome. *See also Diamond Service Station v. Broadway Motor Co.*, 12 S.W.2d 705, 706 (Tenn. 1929) (describing common law storage lien). In response, Alcoa directs our attention to the loss of lien rights contained within Tennessee Code Annotated section 47-7-209(e): "A warehouse loses its lien on any goods that it . . . unjustifiably refuses to deliver." Alcoa argues that by not allowing R&M or any other party to remove the machine, Byrd "unjustifiably refuse[d] to deliver" the Machine, thereby losing its statutory lien rights. Byrd argues that requiring it to surrender possession of the Machine would defeat the very nature of its lien rights.

There is nothing in the record that shows that Byrd "unjustifiably refuse[d] to deliver" the Machine; the refusal to deliver was for unpaid storage rent for the good that was the subject of the agreement. Thus, Byrd did not lose its statutory lien right under Tennessee Code Annotated section 47-7-209(e). Byrd's common law storage lien right was also still in effect. *See Diamond Service Station,* 12 S.W.2d at 706 (describing the common law lien for storage). The requirement to mitigate damages does not compel a party to surrender its legal rights.

Despite Alcoa's assertion that it would be easy for Byrd to mitigate damages, we find that Alcoa ignored Owner's expertise regarding whether the Machine could be removed without tearing down the building – even by attempting to cut up the machine into smaller pieces. Unlike Cromwell, who had limited knowledge of the Machine, Owner was directly involved in the placement of it on the property and personally operated it. Pursuant to the Original Agreement, "Lessor [Alcoa] will have no obligation or duty whatsoever with respect to the repair, replacement or rehabilitation of any portion of Lessee's premises, necessitated by such removal. In view of Byrd's financial condition, it was clearly cost prohibitive for it to incur any costs and potential damages resulting from the removal of the Machine. Because Alcoa was responsible for "[a]ll costs and expenses incident to such removal and return of the machine," and was to benefit from R&M performing the task at its cost, Alcoa was in the better position to mitigate the damages.

The Original Agreement further provided that "[s]hould Lessee [Byrd] refuse to remove and return the machine . . . , Lessor [Alcoa], without any liability in trespass or in any other manner for damages, may enter the premises of Lessee and dismantle and remove the machine." Additionally, the Used Equipment Sales Agreement between R&M and Alcoa reflected the following: "Upon failure of the Buyer [R&M] to remove

any item . . . the Seller [Alcoa] shall have the option of removing and storing such items . . . at the sole expense and risk of the Buyer or deeming all deposits or partial payments as having been forfeited by the Buyer, in which case the Seller may resell (without notice) at public sale or otherwise dispose of such items . . . at the sole risk and expense of Buyer. The Buyer shall remain liable for fees, expense and damages arising from any default by the Buyer." Accordingly, Alcoa is unable to argue that it had no right to remove the Machine from Byrd's property because it had sold the item to R&M. Alcoa was clearly in an equal or better position to mitigate damages by simply paying whatever small amount of past due rent Byrd believed to be owed, which would have allowed the removal of the Machine from Byrd's premises and eliminated any remaining lien rights.

As to Byrd's failure to send invoices constituting a failure to satisfy the duty to mitigate damages, the record reflects that Alcoa was on notice that Byrd believed it was owed additional rent. Owner mentioned several times to various Alcoa-connected officials that he thought he was entitled to more money. There is no evidence, however, that anyone ever made an attempt to resolve the matter. Instead, the record reflects that Alcoa officials believed that because the Lease Agreement had expired and Byrd had been paid a substantial sum with the "mothball" payment, Byrd had already received enough compensation. This also appears to be a matter that "fell through the cracks" with Alcoa's closure of its plant.

The record reveals that the Lease Agreement had expired and Byrd was on notice of that fact. Upon remand, the trial court is directed to determine a reasonable amount of rent to compensate Byrd for the continued storage of the machine from May 2012 to the present. Because Byrd was within the statute of limitations for a breach of contract claim, the late filing of the complaint would not constitute a failure to mitigate damages per se, but any factors related to the delay in filing may be considered by the trial court in determining the amount of the rent owed. The court is further directed to explore the available options for the removal of the Machine from Byrd's premises in the most expeditious manner possible at Alcoa's expense pursuant to its contractual rights.

**B.**

Finally, Alcoa alternatively asserts that the common law doctrine of laches bars Byrd from asserting its claims. The doctrine of laches is an affirmative defense based in equity under both Tennessee and Pennsylvania common law. *See* Tenn. R. Civ. P. 8.03; Pa. R.C.P. 1030; *see also In re Estate of Baker*, 207 S.W.3d 254, 264-65 (Tenn. Ct. App. 2006). Alcoa cites to Pennsylvania case law to support its contention that it was prejudiced by Byrd not filing this claim until nearly four years after it learned of the breach. Byrd counters with its contention that an affirmative defense cannot be raised after the initial pleadings. Byrd also alternatively contends that Alcoa has not made a proper showing of laches under Tennessee case law.

An affirmative defense not raised in a motion or in defendant's answer is waived. *See* Tenn. R. Civ. P. 12.08; Pa. R.C.P 1032; *see also In re Estate of Baker*, 207 S.W.3d at 264-65 (finding waiver of the defense of laches based upon failure to affirmatively plead that defense under Tenn. R. Civ. P. 8.03). Alcoa did not assert this defense in its answer or by motion and is raising this issue for the first time on appeal. Therefore, Alcoa has effectively waived the defense of laches, and we find that the assertion of this defense at the appellate stage is impermissible. "It has long been the general rule that questions not raised in the trial court will not be entertained on appeal." *In re Adoption of E.N.R.*, 42 S.W.3d 26, 32 (Tenn. 2001). Thus, this submission of issue is without merit.

## V. CONCLUSION

For the reasons stated above, we affirm in part and reverse in part the decision of the trial court. The case is remanded for further proceedings consistent with this opinion. Costs of the appeal are taxed equally to appellant, B.W. Byrd Metal Fabricators, Inc. and appellee, Alcoa, Inc.

_____
JOHN W. MCCLARTY, JUDGE